[No. D019431. Fourth Dist., Div. One. Feb. 13, 1996.]

ROBERT HEATER, Plaintiff and Appellant, v.
SOUTHWOOD PSYCHIATRIC CENTER et al., Defendants and
Respondents.

**COUNSEL**

Coleman & Shelstad and Michael S. Coleman for Plaintiff and Appellant.

McInnis, Fitzgerald, Rees & Sharkey, Richard D. Barton, Shelley A. Carder, Neil, Dymott, Perkins, Brown & Frank, Robert W. Frank, Hugh A. McCabe, Gibson, Dunn & Crutcher, Robert H. Fairbank, Dirk L. Vincent, Dummit, Faber & Brown, Craig S. Dummit, Jeffry A. Miller, Horvitz & Levy, Lisa R. Jaskol and S. Thomas Todd for Defendants and Respondents.

## Opinion

**NARES, J.**—Robert Heater (Heater) appeals from entry of judgment terminating his suit against Southwood Psychiatric Center and other defendants (collectively, Southwood) for false imprisonment, assault and battery, and medical malpractice. The trial judge found Southwood and the other defendants had detained Heater with probable cause, and the immunity noted in Welfare and Institutions Code section 5278 (part of the Lanterman-Petris-Short Act (LPS Act)) applied to the detention.

Heater asserts the trial court in this case improperly determined the defendants herein were immune from liability. Southwood claims on this appeal the immunity in question is absolute, and no probable cause determination was required. We reject all of these challenges, and affirm the judgment.

### Statement of Facts

#### 1. *Synopsis*

A young man is murdered. His brother becomes withdrawn and despondent and drinks to excess. The brother expresses a need for help. When assistance is sought, the brother also expresses homicidal and suicidal thoughts. Eventually the brother is detained for some days, treated, and then he is released when judged no longer a danger to himself or to others. Welfare and Institutions Code[1] section 5278 provides that individuals authorized to detain "shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." The trial judge found the statute applicable herein. We proceed to a detailed review of the facts below.[2]

#### 2. *Ronald Heater's Murder and the Effects on Robert Heater*

Robert Heater's older brother, Ronald, was murdered on March 21, 1991, at the age of 26. Heater was 23 years old at the time. Although Heater had been living away from his parents, he moved back in with them shortly after his brother's murder. His mother, Beverly Charles, noticed that Heater, who had always been "an outgoing person" and "happy-go-lucky," had now changed. Mrs. Charles could notice the odor of alcohol on him, and Heater was "keeping everything inside."

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]In light of the standard of review set out, *infra*, we recite only the uncontradicted evidence and Heater's version of the relevant events.

### 3. *The Evening of April 15, 1991*

On the evening of April 15, 1991, Heater came home from work. His mother could tell he had been drinking. Heater sat silently on the couch for a while, and then he began to cry. He told his mother, "Mom, I need help." She asked him if he was sure he needed help and Heater kept repeating that he needed to talk with someone. Heater's mother felt her "child [was] falling apart" and determined to seek help for him that evening.

Heater's stepfather, Donald Charles, called two other locations to try to get help for Heater before he called Southwood and spoke to Brent Bowers, an intake counselor. Believing that Heater's "parents were in crisis," Bowers told Mr. Charles to bring Heater to Southwood.

### 4. *Southwood and the Bowers Interview*

Later that evening, Heater's parents brought him to Southwood, where they met with Bowers. Heater told Bowers he wanted to "get" the people who murdered his brother. When asked how he would "get" these people, Heater said "they should have the same thing done to them." Bowers "very much" believed Heater was sincere in making these threats.

Heater's parents gave Bowers the police report on the murder. They told Bowers Heater should not see the report because it contained the location where the murder took place, and Heater's mother "didn't want . . . to have another child taken." Bowers put a note on the report which read: "Patient is not to see this report under any circumstances. This report contains names and numbers of the perpetrators." (Heater's parents did not tell Bowers the murderers were in jail.)

Heater told Bowers no one needed to worry about him because he would not be around much longer. Heater also made statements about killing himself by throwing himself out of a window, hanging himself, or intentionally crashing his car on the freeway. Heater said he tried to drive his car into a tree a week earlier. Bowers believed Heater was sincere about the threats to harm himself or others. Heater also threatened his parents, and Bowers concluded Heater was a danger to his parents, as well as to his brother's murderers or himself.

### 5. *Bowers Completes Intake Form*

Based on the information he received from Heater and his parents, Bowers filled out a form titled "Preadmission Evaluation [and] Intake/Consult Interview." On the form, Bowers wrote that Heater "makes homicidal and

suicidal threats" and had "suicidal and homicidal ideations especially when intoxicated." Heater told Bowers he had smoked marijuana since childhood, was using it on a chronic basis, and was drinking heavily. Bowers also noted Heater's parents said Heater "wants to hunt down perpetrators [of his brother's murder] and kill them." Bowers checked "yes" where the form asked whether Heater had suicidal thoughts and suicidal plans and whether he exhibited assaultive behavior.

Bowers wrote Heater "makes statements about wanting to kill himself[,] i.e. throwing himself out of [a] two-story window[,] hanging himself[,] intentionally crashing his car on the freeway." On a checklist of "Observed Behaviors" Bowers also indicated that Heater "Appear[ed] intoxicated," "Appear[ed] out of control," was "Very depressed," "Suicidal," "Angry," "Hostile," "Threatening," "Agitated," "Suspicious" and "Argumentative."

Finally Bowers wrote on the preadmission intake form that: "[Heater is] making suicidal and homicidal threats and statement[s:] 'I should have ended it on the freeway last night' [and] 'I won't feel better until they (the murderers) can die and feel the pain I do.'"

### 6. *Bowers Informs Heater of Proposed Detention*

Based on what he observed and heard, Bowers concluded Heater posed a danger to himself and others and would qualify for a 72-hour hold under section 5150.[3] When Bowers told Heater he would remain at Southwood, Heater responded, "No, I'm not," and, using profanity, left the room. In Heater's absence Mrs. Charles told Bowers she was worried that Heater might drive his car while under the influence of alcohol. Bowers told Mrs. Charles that Southwood would keep Heater for 72 hours.

---

[3]Section 5150 provides in pertinent part: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team . . . , or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

"Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the officer, member of the attending staff, or professional person, and stating that the officer, member of the attending staff, or professional person has probable cause to believe that the person is, as the result of mental disorder, a danger to others, or to himself or herself, or gravely disabled."

Southwood was a designated facility and Dr. Ari Albala and Nurse Johnnie Reuben were authorized to detain persons under the statute.

### 7. *Bowers Contacts Dr. Albala*

Bowers was not authorized to impose a 72-hour hold or admit patients. Bowers telephoned Ari Albala, M.D., Southwood's medical director. Bowers told Dr. Albala the information concerning Heater. Dr. Albala was informed Heater was extremely upset and was making threats to harm or kill himself, his parents, and his brother's murderers. Dr. Albala was also informed Heater was despondent and depressed and was acting erratically.

Dr. Albala believed Heater was agitated and threatening people. He understood Bowers was concerned about the safety of Heater, his parents, and the Southwood staff. Dr. Albala believed this was significant evidence Heater needed to be hospitalized involuntarily if he refused to be voluntarily admitted.

Concluding it was likely Heater met the criteria for a 72-hour hold, Dr. Albala ordered that a licensed staff member confirm the information and evaluate Heater to determine if he should be admitted pursuant to section 5150, and proceed with admission if it was determined appropriate. Dr. Albala's admission order was received at 10:35 p.m.

### 8. *Nurse Reuben Meets Heater*

About 10:30 p.m., Nurse Johnnie Reuben arrived at Southwood to begin her shift, and began to unlock the front door of the facility. Heater, who had become very irritated and was using profanity, attempted to use the door to get out of Southwood. Heater's parents pulled him away from the door to prevent him from leaving. One of them yelled, "close the door." Reuben, who did not know who was on the other side of the door, responded by closing the door, leaving Heater inside.

After the door closed Heater walked to the lobby elevator and stood against the wall. Subsequently "Code 5" was called on a loudspeaker, bringing several Southwood employees to the scene. Reuben was present.[4]

---

[4]Although Heater asserts "[t]here is evidence that defendant REUBEN was not even in the lobby area at the time the events referenced in [her] Application occurred," this is incorrect. Other witnesses did not recall seeing Reuben, but stated "she very well could have been there." Reuben testified she was there. Nonremembrance of a fact is *not* evidence thereof. (See, e.g., Evid. Code, § 702 [". . . the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter"].) By definition, some witnesses' nonrecollection of Reuben's presence is not "personal knowledge" of her absence, and her own positive testimony is thus conclusive on the question. Because the only evidence

Bowers stated Heater was on a 72-hour hold because he posed a danger to others and the employees should escort him upstairs. Heater left the wall and came toward the employees, stating: "Come on, I'll take you all on," or "I'll take all of you out." He began to remove his jacket. He swore at his parents and also at Reuben and yelled, "I'm going to kill them," and said he wanted to die. The employees believed Heater was dangerous. The employees physically restrained Heater. As Heater was being led away he yelled at his mother, "Bitch, I'm going to get you."

### 9. *Reuben Places a Section 5150 Hold on Heater*

Soon after 10:35 p.m., Reuben, having learned of Dr. Albala's order, evaluated Heater, concluded he had a mental disorder, was a danger to himself and others and met the criteria for a 72-hour hold, and decided to place Heater on a 72-hour hold pursuant to section 5150. Reuben completed an application for Heater to be admitted to Southwood for 72 hours.

At the time she completed the application Reuben was aware Heater had made threats to harm himself and others. She also had received information obtained by Bowers during the intake interview. In addition, she observed Heater's behavior during the code 5.

In the application Reuben wrote Heater "has strong odor [of alcohol] on breath; began fighting [with] parents in lobby, wanting to leave. Parent states he has had ongoing depression since the recent loss of his brother. [Heater] yelling loudly in agitated state. Would not settle down, very volatile. [¶] "[Additional] staff [members] from Southwood arrived in lobby. Mr. Heater stated 'Go ahead, mother fucker, I'll take each one of you out'! Mr. Heater was then restrained [and] brought on the Adult Psych Unit in four [4] point restraints. Extreme agitated state continued." The time of the report was 10:35 p.m.

Reuben also stated on the report that Heater was a danger to himself and a danger to others. Based on the application completed by Reuben, Heater was admitted to Southwood for a 72-hour detention period pursuant to section 5150.

---

is that Reuben was, as she testified, present and observed Heater's aggressive behavior prior to evaluating him, the contrary argument now advanced by Heater must fail.

### 10. *Reuben Provides Heater Advisements*

At approximately 11:15 p.m., Reuben read Heater the "Detainment Advisement" contained in the application for 72-hour detention. On this latter form Reuben wrote: "[Patient] was read his rights and so witnessed. [Patient] continued to yell, I don't want to hear it, 'Bitch'! 'Stick it up your ass.' Right[s] continued to be read - until completed."

### 11. *Reuben Medicates Heater With Tranquilizer*

At approximately 2 a.m. (April 16), Reuben injected Heater with Ativan pursuant to the order of James M. Sambs, M.D., the psychiatrist assigned to treat Heater. Reuben administered the Ativan because Heater, who was in restraints, was struggling and highly agitated. Reuben testified she told Heater what the medication was for.

Sometime after 2 a.m., Reuben again read Heater the "Detainment Advisement" and "Advice of Rights, Involuntary Patient" forms. She described to Heater the events leading up to the 72-hour hold and explained he was being held because of his behavior, threats, and drinking. She also read Heater his rights as set out in a leaflet posted at Southwood. At 6 a.m. Reuben administered additional Ativan to Heater.

### 12. *Dr. Sambs and Heater*

Later on April 16, Heater told Dr. Sambs he was going "to get the mother fuckers who did it (killed his brother). They're dead." Heater stated this was a "promise." Heater also saw Mark Boysen, a social worker, and said he wanted to go after the people who killed his brother. That day, Dr. Sambs spoke by telephone with Heater's mother, Mrs. Charles. Mrs. Charles said she was afraid of Heater when he was drinking. On April 17, Heater had a telephone conversation with his mother, who realized then Heater had not been calm while at Southwood.

Later on April 17, Dr. Sambs met with Heater and his parents. Mrs. Charles again told Dr. Sambs that Heater scared her. She also told Heater he needed to calm down. After Heater left the room, Dr. Sambs told Mr. and Mrs. Charles he believed Heater was a danger to himself or others. Dr. Sambs also said he could keep Heater in Southwood for an additional 14 days and would obtain a court order to do so. In his notes of the meeting, Dr.

Sambs wrote that he recommended placing Heater on a 14-day hold[5] and "[w]ill let hearing office decide re: discharge."[6]

On April 18, 1991, Dr. Sambs filled out and signed a "Notice of Certification" form. The form (which provided a space for a second signature) stated the signers certified Heater, as a danger to others and a danger to himself, was to receive intensive treatment at Southwood for no more than 14 days beginning April 18. The form stated Dr. Sambs's conclusion Heater was, as a result of a mental disorder or impairment by chronic alcoholism, a danger to himself or others. As the basis for this conclusion Dr. Sambs wrote that Heater "verbalized 'promises' to kill alleged murderers of his brother. Extremely poor impulse control. Increased alcohol use. Very volatile, arbitrary [and] unpredictable. Said he should have killed self." Heater continued to refuse voluntary treatment.

### 13. The 14-day Certification by Two Doctors

Dr. Sambs wrote in Heater's medical record he had "Completed 14 d certification" and read and explained to Heater his rights, and would request another physician, Dr. Katz, consult on the 14-day certification.

That day Dr. Katz met with Heater at Dr. Sambs's request to determine whether Heater met the criteria for a 14-day hold. Dr. Katz understood from his discussions with Dr. Sambs and his review of nursing notes that Heater came to Southwood in a very agitated state and was threatening both himself and others.[7]

Dr. Katz further understood Dr. Sambs was still concerned about Heater's stability and the potential danger Heater posed to himself or others. Dr. Katz was informed Heater had made suicidal threats and was aware that at Southwood Heater had threatened his brother's murderers. Dr. Katz also knew Heater had been placed in restraints.

[5]Section 5250 authorized the certification of a person for 14 days of intensive treatment when, among other things, the person is found to be a danger to himself or others or gravely disabled. Two authorized persons must sign a notice of certification to effect the fourteen-day hold. (§§ 5251, 5252.) Dr. Sambs and the psychiatrist who provided the second signature, Mark R. Katz, M.D., were authorized to certify persons for a 14-day hold under the applicable statutes.

[6]A person certified for 14 days of intensive treatment pursuant to section 5250 is entitled to a certification review hearing within 4 days of the date of certification to determine whether probable cause exists to detain the person for intensive treatment. (§§ 5254, 5256.) The certification review hearing may be conducted by a court-appointed commissioner. (§ 5256.1.)

[7]Heater incorrectly asserts the medical record does not indicate he threatened to hurt himself or others while at Southwood. In fact, the record contains numerous references to such threats.

Based on his interview with Heater, discussions with Dr. Sambs and the Southwood staff, and also on his review of Heater's records, Dr. Katz concluded Heater suffered from a mental disorder and was still a danger to others and was possibly still a danger to himself. Dr. Katz therefore provided the second signature on the notice of certification form, which was required in order to place Heater on the 14-day hold contemplated by sections 5250, 5251 and 5252.

### 14. *The Review Hearing*

On April 22, a superior court commissioner held a hearing at Southwood to determine whether Heater should be detained for further treatment. Heater, his mother, Dr. Sambs and others attended the hearing. At some point during the hearing, although at what precise point he could not be sure, Dr. Sambs changed his previous opinion. Dr. Sambs now concluded Heater no longer was a danger to himself or others, so he testified that at that time it seemed Heater was not a danger, either to himself or others.

The commissioner determined there was cause to believe Heater was suffering from a mental disorder, but in medical opinion he was not a danger to himself or others at the time of the hearing. Accordingly, the commissioner found Heater no longer could be detained. Heater was thereupon released from Southwood.

### STATEMENT OF THE CASE

On August 31, 1992, Heater filed a first amended complaint against Southwood, Dr. Albala, Reuben, Dr. Sambs, and other defendants, alleging false imprisonment, assault and battery, negligent and intentional infliction of emotional distress, medical malpractice, libel and conspiracy.

On May 18, 1993, the trial court held a hearing under Evidence Code section 402 to determine the applicability of the immunity afforded by the LPS Act (§ 5278), the impact of the immunity on Heater's claims, and the admissibility of certain evidence.

On May 20, 1993, after three days of testimony, the court ruled defendants were immune from liability and the immunity extended to all of Heater's claims. The court entered judgment on behalf of defendants on all causes of action. Heater appealed.

### STANDARD OF REVIEW

The dismissal of Heater's complaint is akin to a grant of summary judgment, and "[o]n review of a summary judgment in favor of the defendant, we review the record do novo to determine whether the defendant has

conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)" (*Ann M.* v *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

## DISCUSSION

### I. *Heater's Appeal*

Although Heater's briefing on appeal addresses many topics, the heart of his argument is that there was presented sufficient evidence of (1) his false imprisonment (detention *not* "in accordance with the law"),[8] (2) assault and battery (unconsented-to medication), and (3) medical malpractice (which Heater asserts is not included within the § 5278 immunity) for the case to have gone to a jury.[9] We discuss each of these contentions in turn.

### A. *False Imprisonment*

### 1. *Factual Background*

Heater begins his argument he was falsely imprisoned by asserting, "It is a fact that [Heater] was . . . admitted before defendant REUBEN assessed him for purposes of a '5150 hold'." Heater also contends he was admitted at 10 p.m. "without a physician's order." The record, however, refutes these claims.

Heater was not admitted to Southwood until *after* Reuben evaluated him pursuant to Dr. Albala's order and concluded a 72-hour detention was appropriate. (See the Statement of Facts, pts. 7, 8 and 9, *ante*.)[10]

Essentially, Heater now argues his 72-hour detention was initiated by Bowers, not Reuben, and thus was not "in accordance with the law."

---

[8]Heater asserts his detention could not properly have been based upon his objections to being detained, arguing by analogy to the right of self-defense in criminal cases. This argument, however, *assumes* as a premise that his previous statements concerning desires to kill others and himself did not furnish probable cause for his detention "in accordance with the law." As we conclude otherwise, we do not further address the "self-defense" issue. Heater also asserts the trial court improperly assigned him the burden of persuasion on probable cause for the detention, but this assertion is unsupported by the record.

[9]Heater also separately argues he was not provided required advisements in Southwood. As the trial judge correctly noted in the statement of decision, however, Heater presented no evidence of this assertion, and the record contains evidence of many advisements in fact provided Heater. We do not in these circumstances further address this assertion of error.

[10]Moreover, as respondent Southwood points out, Heater is bound by the judicial admission in his complaint that he was admitted based on Reuben's written application for his admission to Southwood for 72 hours. (See *Logan* v. *Southern Cal. Rapid Transit Dist.* (1982) 136

(§ 5278.) We cannot agree. The statement by Bowers that Heater was going to remain at Southwood was not, and could not have been, the event which triggered a 72-hour detention. Instead, based on the information provided by Heater himself and by his parents, Bowers properly determined there was here a need to have a qualified professional *evaluate* Heater, which was done.

It was the subsequent evaluation and completion of the appropriate forms by Reuben, an authorized person acting at the direction of a medical doctor, which constituted the detention of Heater "in accordance with the law." The prior temporary restraint of Heater until professional evaluation could be obtained is inherent in the process contemplated by the provisions of the LPS Act authorizing detentions. If the homicidal or suicidal must go free unless an "authorized person" is always immediately available, the LPS Act is futile.

### 2. *Legal Standard*

■ The legal standard for initiating a 72-hour detention is well set out in the cases: "To constitute probable cause to detain a person pursuant to section 5150, a state of facts must be known to the peace officer (or other authorized person) that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled. In justifying the particular intrusion, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion. [Citations.] Each case must be decided on the facts and circumstances presented to the [detaining person] at the time of the detention [citation], and the [detaining person] is justified in taking into account the past conduct, character, and reputation of the detainee. [Citation.]" (*People* v. *Triplett* (1983) 144 Cal.App.3d 283, 287-288 [192 Cal.Rptr. 537]; accord, *People* v. *Delahoussaye* (1989) 213 Cal.App.3d 1, 8, fn. 3 [261 Cal.Rptr. 287]; *In re Azzarella* (1989) 207 Cal.App.3d 1240, 1250 [254 Cal.Rptr. 922].)

### 3. *Application of Facts to Standard*

In this case, Reuben was the person authorized to admit Heater for a 72-hour detention pursuant to section 5150. (It is of no moment that Bowers

---

Cal.App.3d 116, 126 [185 Cal.Rptr. 878] ["A party is bound by an admission in his own pleadings. . . ."]; *Los Angeles County-U.S.C. Medical Center* v. *Superior Court* (1984) 155 Cal.App.3d 454, 460 [202 Cal.Rptr. 222] ["Any admissions found in the pleadings may be considered by the court and are binding on the plaintiff."].)

told Heater he "would" be detained, because (as Southwood was clearly aware) Bowers lacked the authority to initiate an involuntary detention.)

The question properly focused on by the trial court was "[w]hether there is a question of fact as to whether [Heater] was assessed in person by the professional person in charge of . . . Southwood or his . . . designee to determine the appropriateness of the involuntary detention . . . ." That question was correctly answered in the negative: Heater was assessed in person by Reuben, acting at the direction of a medical doctor. Had Reuben's assessment been that Heater was *not* a danger to himself or others she would have so reported. She properly came to the contrary conclusion, and there is no question of fact as to whether Heater was properly detained under the law.

## B. *Assault and Battery*

Heater also asserts the administration to him of a tranquilizer, Ativan, constituted an unconsented-to battery. Again, this assertion is predicated upon both a misstatement of the record and a misreading of the applicable statutory and case authorities. Because there is no requirement an involuntary detainee consent to administration of medication apart from a small class of antipsychotic drugs not involved here, we reject Heater's contrary arguments.

### 1. *Factual Background*

As noted in the Statement of Facts, *ante*, part 11, about 2 a.m. on the morning of April 16, Reuben injected Heater with the drug Ativan, a tranquilizer, as Heater was in restraints, struggling, and highly agitated. Reuben told Heater what the medication was for. Heater was later that morning given two more doses of Ativan.

The evidence is that Ativan is merely "a short-acting tranquilizer." While Heater's counsel below made an offer of proof that a doctor would testify that in her opinion "Ativan is customarily prescribed for the treatment of symptoms of psychosis and other severe mental and emotional disorders," there was no evidence proffered that Ativan is an "antipsychotic medication" as described below. It was counsel's position that "no medication can be

administered to the patient—an involuntary patient in a psychiatric facility without their consent and except in an emergency situation."[11]

## 2. *Legal Standard*

In *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1324 [271 Cal.Rptr. 199], the court held that "[u]nless the incompetence of a person refusing drug treatment has been judicially established, 'it is the individual who must have the final say in respect to decision regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires.' [Citation.] The Legislature has made it eminently clear that this right does not disappear upon involuntary commitment."

By Statutes 1991, chapter 681, section 3, in enacting section 5332 the Legislature codified the procedures for the administration of antipsychotic medications to persons involuntarily detained pursuant to section 5150 or 5250. The statute provides for advisement and expedited hearings as to capacity and for determination of medical necessity for use of such medications, among other things. The statute provides: "In the case of an emergency, as defined in subdivision (m) of section 5008, a person detained pursuant to section 5150 . . . may be treated with antipsychotic medication over his or her objection prior to a capacity hearing . . . ." (§ 5332, subd. (d).)

Statutes 1991, chapter 681, section 1, added both subdivisions (*l*) and (m) to section 5008. Section 5008, subdivision (*l*) states: " 'Antipsychotic medication' means any medication customarily prescribed for the treatment of symptoms of psychoses and other severe mental and emotional disorders." Section 5008, subdivision (m) states: " 'Emergency' means a situation in which action to impose treatment over the person's objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others, and it is impracticable to first gain consent. It is not necessary for harm to take place or become unavoidable prior to treatment."

## 3. *Application of Facts to Standard*

Two things are clear, and dispositive. In the first place, the legislative direction for consent and hearings on capacity with respect to administration

---

[11]While Heater's counsel also refers in the briefs to the drug Halcyon, Heater never received this drug at Southwood.

of "antipsychotic medication" to involuntary detainees necessarily implies no such procedures are required for other medications. In the second place, there is no evidence Ativan is within the class of "powerful mind-altering drugs" (*Riese* v. *St. Mary's Hospital & Medical Center*, *supra*, 209 Cal.App.3d at p. 1324) concerning which the statutory procedures address.[12]

Last, were more needed, the fact remains that Ativan was given to Heater because he was struggling and highly agitated, and it was hoped the tranquilizer "would help to relieve his level of agitation and he could actually come out of the restraints." Given the described circumstances, administration of a short-acting tranquilizer was not only reasonable, but was the only practical measure at hand for Heater's own protection, and its administration did not amount in any sense to a battery, but was within the scope of the immunity contemplated by section 5278.

### C. *Medical Malpractice*

Section 5278 states that individuals authorized to detain "shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." Heater's last argument is that in some manner civil liability for malpractice is not thereby precluded. Not so.

First, the fact that the persons in question "shall not be held . . . civilly liable for exercising that authority in accordance with the law" on its face precludes Heater's assertion; obviously, being liable for medical malpractice is but one form of being "civilly liable." Second, while Heater points to various Government Code sections dealing with public employee immunity and liability, as Heater also admits, these statutes are "not applicable to the defendants in the instant matter."

It is also correct, as pointed out by Southwood, that section 5278's immunity extends to the detention of persons for "*treatment* and evaluation." (Italics added.) When read together with section 5152, which itself mandates treatment be provided to involuntary detainees, no other conclusion is possible than that section 5278 means precisely what it says it means, and that civil liability, whether for battery, for false imprisonment, or for medical malpractice is precluded insofar as the detention is "in accordance with the law." As we have concluded above Heater's detention was lawful, his claim must be rejected in this respect also.

---

[12]"Ativan . . . is indicated in adult patients for . . . relief of anxiety . . . ." (Physicians' Desk Reference (37th ed. 1983) at p. 2145.) No mention is made of any antipsychotic usage.

## II. *Southwood's Argument*

■ Southwood (alone among the respondents) argues that no probable cause hearing was required, and the immunity which is set out in section 5278 should be analogized to the immunity for reporting suspected child abuse set out in Penal Code section 11172, subdivision (a). We cannot agree.

Penal Code section 11172, subdivision (a) states that as to specified groups of persons, no member thereof "who reports a known or suspected instance of child abuse shall be civilly or criminally liable for any report required or authorized by this article." Section 5278, by contrast, authorizes immunity for specified persons who act "in accordance with the law." We believe this distinction, contrary to Southwood's argument, has meaning.

As our Supreme Court has observed: " 'We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent.' [Citation.] We must begin with the words of the statute. [Citation.] . . . The statutory language, of course, is the best indicator of legislative intent. [Citation.]" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

The entire preceding discussion of Heater's claims was in fact necessitated by the statute's directive requiring his detention be "in accordance with the law." The language which Southwood asks us to disregard, "the best indicator of legislative intent," can only mean what it plainly says: that while intrusions on personal freedom may be necessary in certain circumstances, those circumstances must be both defined and limited, as was required in this case.

Additionally, as this court has noted in the past, "[t]he LPS Act must be construed to promote the intent of the Legislature, among other things, to end the inappropriate, indefinite and involuntary commitment of mentally disordered persons, to provide prompt evaluation and treatment and to protect mentally disordered persons (§ 5001)." (*Michael E.L.* v. *County of San Diego* (1986) 183 Cal.App.3d 515, 525 [228 Cal.Rptr. 139].)

Clearly, an *absolute* immunity would not tend to "end the inappropriate commitment of mentally disordered persons," but would tend instead to promote such by relieving commiters from the necessity of compliance with statutory directives. Also, the proposed absolute immunity would derogate from, rather than advance, "prompt evaluation and treatment." Thus, it is beyond doubt that Southwood's proposed reading of the statutory immunity would not protect, but would instead expose to the possibility of abuse, the mentally disordered.

Further, the rationale behind the distinction in the two immunity statutes is obvious: while an incorrect report may carry collateral consequences of upset or anger after an investigation triggered by the report determines that it was incorrect, a false imprisonment not in accordance with the law is a far more serious and immediate consequence for the person concerned.

Under Southwood's interpretation, a health care provider authorized to commit persons to 72-hour detentions could use such power to, for example, punish an errant child, a spouse, or a quarrelsome neighbor, with no consequent liability for such abuse of power. While it is true "[c]ourts may, of course, disregard even plain language which leads to absurd results or contravenes clear evidence of a contrary legislative intent" (*Ornelas* v. *Randolph* (1993) 4 Cal.4th 1095, 1105 [17 Cal.Rptr.2d 594, 847 P.2d 560]), neither situation obtains here. "The statute, in short, may be read to mean precisely what it says." (*Ibid.*) We reject the contrary assertion.

### DISPOSITION

The judgment is affirmed. All parties to bear own costs on the appeal.

Benke, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied March 7, 1996, and appellant's petition for review by the Supreme Court was denied May 1, 1996. Mosk, J., and Chin, J., were of the opinion that the petition should be granted.