[No. B154191. Second Dist., Div. Two. Jan. 7, 2003.]

THERESA CRUZE, Plaintiff and Appellant, v.
NATIONAL PSYCHIATRIC SERVICES, INC., Defendant and
Respondent.

## COUNSEL

Law Offices of Jeffrey B. Bohrer and Jeffrey B. Bohrer for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith and Louis R. DeStefano for Defendant and Respondent.

## OPINION

**BOREN, P. J.**—Suffering from a terminal illness and from severe stress after losing her job, her apartment and her boyfriend, appellant Theresa

Cruze visited her physician and began discussing the possibility of suicide. The physician and others initiated a 72-hour psychiatric hold and evaluation under Welfare and Institutions Code section 5150[1] resulting in appellant's being held 17 hours in the facility operated by respondent Ingleside Hospital.[2] After her discharge and release, appellant filed a complaint against respondent and certain individual defendants,[3] alleging medical malpractice, negligence, false imprisonment, infliction of emotional distress, defamation and other torts. Finding that under section 5278, respondent was immune to the lawsuit, the trial court granted respondent's motion for summary judgment and gave judgment to respondent. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[4]

Thomas E. Conklin, M.D., a licensed California physician and a general practitioner in Northridge, began treating appellant in April 1998. Dr. Conklin treated appellant for Ehler-Danlos Syndrome (EDS),[5] upper respiratory infection and other conditions, and authorized refills of her prescriptions for Soma and Percocet. Respondent's hospital is a facility designated by the County of Los Angeles and approved by the State Department of Mental Health as a facility for 72-hour psychiatric treatment and evaluation pursuant to various provisions of the Lanterman-Petris-Short Act (the LPSA.)[6]

Appellant came to Dr. Conklin's office on May 27, 1999. Appellant complained of "great stress" resulting from appellant's "being fired from her

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]For convenience we shall refer to respondent as "Ingleside Hospital," inasmuch as the parties and most of the official documents so refer to respondent and its facilities. The correct designation of respondent is National Psychiatric Services, Inc., doing business as City of Angels Medical Center Downtown Campus and Ingleside Campus. Respondent was apparently erroneously sued as "City of Angels Hospital." We shall also refer to respondent's organization and facilities, including the psychiatric facility, as "the Hospital."

[3]The individual defendants are Thomas E. Conklin, M.D., Jonathan L. Brand, M.D., and Larry (Lawrence) Apodaca. These defendants are not parties to this appeal. The record on appeal shows that Dr. Brand also was awarded summary judgment.

[4]We note that the narrative of facts that appellant sets out in her opening brief is unaccompanied by appropriate citations to the record on appeal as required by rule 14(a), California Rules of Court. We will exercise our discretion not to strike the brief. (See rule 14(e).)

[5]The internet website (www.ednf.org) of the Ehler-Danlos Foundation describes EDS as follows: "Individuals with EDS have a defect in their connective tissue, the tissue which provides support to many body parts such as the skin, muscles and ligaments. The fragile skin and unstable joints found in EDS are the result of faulty collagen. Collagen is a protein, which acts as a 'glue' in the body, adding strength and elasticity to connective tissue."

[6]Sections 5000-5587.

job, housing problems, and having problems with her boyfriend." The relationship between appellant and her boyfriend Steve Bardfield had recently deteriorated, primarily because of his lack of "faithfulness." The day before her appointment with Dr. Conklin, appellant had received a 30-day notice to quit her apartment. Either the day before her visit to Dr. Conklin or that day, appellant's employer told her that her employment was being terminated. In addition to EDS, appellant also has herniated discs and has endured numerous surgeries. She also has problems with her ribs popping out when she was under stress "[b]ecause I tighten up, my muscles tighten up, and it can cause things to pop out . . . of place [and] it might not be able to go back into place because I'm very tight and stressed." She was in constant pain—"a lot of pain." Appellant was taking daily medication both for pain and muscle spasms. Appellant did not tell Dr. Conklin that she was out of pain medication. She was upset and angry over all of these problems.

During her visit to Dr. Conklin, appellant told him that she had had thoughts of suicide, was depressed, wanted to sleep for a week, and was very tired and in pain. She indicated that she recently had had thoughts of suicide due to her current problems. She said that she felt overwhelmed.

Appellant's expressions caused Dr. Conklin to believe that appellant was entertaining thoughts of suicide. Dr. Conklin asked her if she was presently having suicidal thoughts. Appellant "said she has had them in the past and again recently with the above stressors." Because Dr. Conklin knew that appellant had multiple medications at home in lethal amounts, Dr. Conklin became concerned that appellant "would harm herself."

Dr. Conklin immediately contacted psychiatrist Hyman Weiland, M.D., who suggested that Dr. Conklin call Ingleside Hospital. He did so, and the Hospital dispatched Larry Apodaca, a licensed clinical social worker and a member of the Hospital's staff and mobile crisis team (authorized under the LPSA to evaluate and assess persons for possible psychiatric intervention). About an hour after Dr. Conklin had called, Apodaca arrived at Dr. Conklin's office and consulted with the physician. Dr. Conklin informed Apodaca that he had been treating appellant for EDS and was concerned because appellant was now depressed and constantly sobbing. Apodaca observed that appellant was still sobbing and extremely upset. Dr. Conklin also told him that appellant had recently lost her job, had been evicted from her home, and was complaining about her mentally abusive boyfriend. Dr. Conklin also said that he thought appellant should be confined for her own protection. Apodaca spoke with appellant, who told him that she felt that there was no solution to her problems, especially with regard to EDS. Apodaca evaluated

and assessed appellant and concluded that, in accordance with the LPSA, there was probable cause to believe that appellant was a danger to herself or to others. Apodaca then transported her to Ingleside Hospital and applied for her admission.

At the Hospital, Pamela Teeter, R.N., was the assigned "Crisis Clinician" and was certified to assess individuals to determine whether they met the criteria for involuntary commitment pursuant to section 5150. She reviewed the information contained in Apodaca's written application for 72-hour detention for evaluation and treatment and his consultation summary regarding appellant. Her assessment of appellant was that appellant was distraught emotionally and physically, depressed and in crisis. Based on the information she had and from the documentation provided to her, including the information that appellant was again having suicidal thoughts and had access at home to lethal amounts of pain medication, Teeter concluded that appellant met the criteria for involuntary detention under section 5150. Appellant told Teeter, "I know I should have kept my mouth shut—look where I ended up." Teeter concluded from this remark that appellant "regretted telling Dr. CONKLIN that she was thinking of hurting herself because she wound up in the hospital."

The Hospital then telephoned Jonathan L. Brand, M.D., a psychiatrist on the staff of the Hospital. On the information he was provided, Dr. Brand issued a telephone order to admit appellant to Ingleside Hospital pursuant to section 5150 based upon a diagnosis of major depression with suicidal ideation.

A nurse at the Hospital (J. Benkert) provided appellant with the written and oral advisement required by section 5157.[7] The advisement stated that appellant was being "admitted for 72-hour evaluation" and "placed in this psychiatric facility because it is the opinion of the professional staff, that as a result of a mental disorder, you are . . . Dangerous to yourself." The advisement signed by the nurse also stated: "We feel this is true because you state, 'I feel there's no solution[.']—Dr. Conklin MD is concerned because pt [patient] has multiple lethal meds @ home & made suicidal statements to him—lost her job & her boyfriend. You will be held for a period of up to 72 hours. This (does not) (does) include weekends or holidays. Your 72-hour period will begin: 5-27-99 1700. Your 72-hour evaluation and treatment period will end at: 5-30-99 1700."

The day following her detention, appellant was released from the Hospital—May 28, 1999.

---

[7]The written advisement was provided on a preprinted form, filled in with handwriting, apparently that of Nurse Benkert.

After giving the notices of intent to commence legal action (required by Code Civ. Proc. § 364), appellant filed a complaint against respondent and the other defendants, alleging causes of action for medical malpractice, professional negligence, false imprisonment, abuse of process, assault, battery, invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, trespass to personal property, libel, slander and civil conspiracy.

Respondent filed a motion for summary judgment, contending that under section 5278 it was immune from lawsuit. The trial court granted the motion for summary judgment and gave judgment in favor of respondent.

## APPELLANT'S CONTENTIONS

Appellant contends:

1. The trial court erred in granting respondent's motion for summary judgment because respondent was not entitled to the immunity provided by section 5278 and because that section does not provide immunity for "willful, wanton and intentional misconduct."

2. The trial court abused its discretion in denying appellant's motion for relief from summary judgment.

3. "Appellant had a right to treatment at [respondent's] facility."

## DISCUSSION

■ On a grant of summary judgment, our appellate review is de novo and limited to determining whether there is no genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. (*Wilson v. Blue Cross of So. California* (1990) 222 Cal.App.3d 660, 670 [271 Cal.Rptr. 876].) After de novo review of the record on appeal, we find that appellant's contentions on appeal are without merit, and we therefore will affirm the judgment in favor of respondent Hospital.

When a person, as the result of a mental disorder, is a danger to others or to himself or herself, section 5150,[8] the primary section of the LPSA, authorizes certain professional persons to hold such a person in an approved

---

[8]Section 5150 provides: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person

mental health facility for a 72-hour period of psychiatric treatment and evaluation. Depending on the circumstances and outcome of the treatment and evaluation, the LPSA also authorizes detention, treatment and evaluation of such a person for even longer periods. In the case at bench, however, only the initial 72-hour detention is implicated.

Section 5278 of the LPSA encourages the protection of those endangered by a person suffering from mental disorder. This protection extends to the mentally disordered person himself or herself, as well as to others. To encourage professional persons and institutions to apply the law properly and to provide the protection of the LPSA, section 5278 states that individuals authorized to detain under the LPSA "shall not be held criminally or civilly liable for exercising this authority in accordance with the law." Appellant argues that this immunity does not apply to respondent Hospital. Appellant is incorrect.

 Appellant first asserts that the immunity of section 5278 does not apply to protect respondent because the Hospital is not an "individual," the term used in the statute.[9] But California courts have applied this immunity to entities that are not natural persons. In *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068 [49 Cal.Rptr.2d 880] the Court of Appeal applied the immunity to the mental health facility itself. (*Id.* at p. 1083.) That opinion did not construe "individuals" as used in the statute but broadly applied the immunity to any lawful detention under the LPSA. Appellant cites *Brimmer v. California Charter Medical, Inc.* (1986) 180 Cal.App.3d 678 [225 Cal.Rptr. 752], but the case does not advance appellant's argument and is inapposite. The Court of Appeal in *Brimmer* affirmed the granting of nonsuit in favor of defendants—individual psychiatrists—where the plaintiff had been detained pursuant to section 5150. The immunity of section 5278 is briefly discussed in *Brimmer,* not in the context of whether an institution is exempted from immunity but rather in the context

---

designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation. [¶] Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the officer, member of the attending staff, or professional person, and stating that the officer, member of the attending staff, or professional person has probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled. If the probable cause is based on the statement of a person other than the officer, member of the attending staff, or professional person, such person shall be liable in a civil action for intentionally giving a statement which he or she knows to be false."

[9]The statute states: "*Individuals* authorized under [the LPSA] . . . shall not be held either criminally or civilly liable . . . ." (§ 5278, boldface italics added.)

of jury instructions on probable cause to detain. (*Brimmer v. California Charter Medical, Inc.*, *supra*, at pp. 685-686.)

An important consideration for our analysis is that nothing in the statute remotely suggests that the Legislature intended to limit the immunity provision to apply only to natural persons, as appellant suggests. Appellant's citations to other statutory provisions where the word "individual" is specifically so defined are not helpful or authoritative. That the Legislature in some other statutory contexts found it necessary to limit the term "individuals" to "natural persons" demonstrates that the term has a meaning broader than that claimed by appellant.

Moreover, our research reveals the California Court of Appeal has long construed the word "individual" so as to ordinarily embrace the broader meaning. In *Nelson v. United States Fire Ins. Co.* (1968) 259 Cal.App.2d 248 [66 Cal.Rptr. 115], the court stated: "The word 'individual' is defined in Webster's Third New International Dictionary as 'a single or particular being or thing or group of beings or things: as . . . a particular being or thing as distinguished from a class, species or collection . . . an indivisible entity or a totality which cannot be separated into parts without altering the character of significance of these parts. . . .' In Black's Law Dictionary the word is defined as follows: '[A] single person as distinguished from a group or class, and also, very commonly, a private or natural person as distinguished from a partnership, corporation or association; but it is said that this restrictive signification is not necessarily inherent in the word, and that it may, in proper cases, include artificial persons.' In light of these definitions the rule seems to be that the word 'individual' is broad enough to embrace corporations and partnerships, and that where the context does not indicate otherwise, the word includes corporations, partnerships and associations as separate entities in contradistinction to a collective class or group. (*Georgetown College v. Webb*, 313 Ky. 25 [230 S.W.2d 84, 86]; *National Accounting Co. v. Dorman*, 11 F.Supp. 872, 873.) [¶] In light of the foregoing, the word 'individual' in its broad sense includes . . . a corporation . . . ." (*Nelson v. United States Fire Ins. Co.*, *supra*, at pp. 253-254.)

■ We are obligated to construe a statute to harmonize it with its related parts, and the prime rule of construction is to ascertain from the language of the statute the legislative intent underlying the statute—even where the statute is not ambiguous. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1695, 1697 [8 Cal.Rptr.2d 614].) We are also mindful that judicial disregard for the literal meaning of statutory language to avoid absurd results is a procedure to be used sparingly. (*Id.* at pp. 1698-1699.)

With these principles in mind, we observe that nothing in the LPSA limits the word "Individuals" in section 5278 to meaning "natural persons." Consistent with *Nelson v. United States Fire Ins. Co., supra,* 259 Cal.App.2d at pages 253-254, we construe the statutory use of the word here as including within its plain meaning individual entities such as hospitals and clinics.

Moreover, it is clear that the purpose of the procedures set out in the LPSA would be defeated if the immunity only applied to individual professionals but not to the institutions with which they are affiliated or employed. To hold that nurses, physicians, psychiatrists, and social workers of the Hospital have immunity, but not the Hospital, would make any immunity illusory. Without the immunity, the dangers represented by mentally disturbed persons are considerably amplified. We therefore construe use of the word "Individuals" in section 5278 to have its broader meaning and hold that the immunity of that section encompasses the institutions and agencies with which health care professionals are associated, affiliated or employed.

Appellant next asserts that somehow the immunity does not apply because the Hospital improperly failed to medicate appellant and falsified records. The record simply does not support these allegations. Even appellant's own declaration in opposition to the motion for summary judgment does not state that she received no pain medication. She merely states that she was out of medication at home.

Appellant relies entirely on a laboratory report of a drug testing of a blood sample given by appellant after her release from the Hospital and on the declaration of John Beck, M.D. Appellant's hospital records indicate that on May 27, 1999, appellant was administered Vicoden, Darvocet and Restoril, and that the next day she received Tylenol. Dr. Beck's declaration states that "had plaintiff been administered Darvocet and Restoril . . . these drugs . . . would have showed in the lab results." The problem with appellant's argument is that Dr. Beck provides no foundation whatsoever for the laboratory report that appears in the record. And Dr. Beck does not state that appellant was not properly medicated. The laboratory report itself is not self-explanatory, has no foundation, and does not on its face contradict appellant's medical records.

Regarding appellant's admission into the Hospital, appellant characterizes the statements of the health care professionals, who found probable cause to detain appellant, as also revealing a falsification of records. They do not. More importantly, despite appellant's argument about what constitutes an "assessment" and her untenable argument that the defendants did not consider her medical history, it is clear that appellant does not contend that there

was not probable cause to detain her. Appellant's counsel specifically stated in the trial court that probable cause was not an issue.

Appellant's own declaration does not deny that she was expressing a suicidal ideation or that she was a danger to herself. She merely contradicts a few details stated by the health care professionals. For example, she declares that, upon arrival at the hospital, she spoke with Nurse Teeter for only a few minutes, but that Nurse Teeter asked her no questions regarding whether or not she had ever tried to commit suicide or had thought about suicide. She does not deny that Nurse Teeter was aware of her statements to the other professionals. She also states, as to the degree of pain she was feeling that day, that she had "been in that type of pain hundreds, if not thousands of times, over the past 40 years." She declares that she stated to "DR. CONKLIN ONLY, that I wanted to go to sleep for a week [and] . . . that there was no MEDICAL solution to my disease, a fact that Dr. Conklin already knew." She does deny that she stated or intimated to Dr. Conklin "that I wanted to go to sleep forever." She also states that on the day of her detention she was completely out of pain medication and her purpose in making an appointment with Dr. Conklin was to obtain a refill of her pain medication. But she does not declare that she informed Dr. Conklin of that fact.

Even if the record supported appellant's claim of failure to medicate, it is clear that the immunity provided by section 5278 covers such malpractice, and *Heater v. Southwood Psychiatric Center, supra* 42 Cal.App.4th 1068, so held. (*Id.* at p. 1083.) If this were not the case, every detention under section 5150 could result in a malpractice lawsuit, and section 5278 would be rendered meaningless.

We reject appellant's contention that respondent committed any willful, wanton and intentional misconduct so as to negate the immunity of section 5278. We need not linger on the question of whether the statutory immunity is not applicable where there is such conduct. The instant record does not show any such conduct by the Hospital or its agents. Probable cause to detain is ample, and appellant does not dispute that. The question of what treatment appellant received after admission and during her 17-hour stay in the Hospital is not relevant where the detention is shown to be lawfully based on probable cause. But even if the question were relevant, appellant presented no evidence demonstrating any misconduct by respondent. The unsupported claims of failure to administer prescribed pain medication and of document falsification do not raise any triable issues of fact in that regard.

The trial court properly denied appellant's motion for relief from summary judgment as well. That claim was founded on the assertion that

appellant was not properly admitted to the Hospital. Appellant tortured the record to raise that claim. The record is not ambiguous in this regard, despite appellant's contrary claim. In a telephone communication, Dr. Brand, after receiving essentially the same information acquired by Apodaca and Nurse Teeter, issued a telephonic order admitting appellant to the Hospital. That order was clearly based on probable cause. The detention was therefore lawful, and the immunity of section 5278 applicable. (*Heater v. Southwood Psychiatric Center, supra,* 42 Cal.App.4th at p. 1083.)

Because appellant's contention that she had a right to treatment is subsumed in the issues we have already addressed, we discuss it no further. Because respondent is entitled to immunity from lawsuit, the issue is also moot.

### DISPOSITION

The judgment is affirmed.

Nott, J., and Doi Todd, J., concurred.

A petition for a rehearing was denied January 28, 2003.