Filed 5/31/13  Morton v. Spotts CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KIM MELANIE MORTON, | D058640 |
| Plaintiff and Appellant | |
| v. | (Super. Ct. No. 37-2008-00099933-CU-OR-EC) |
| DANA SPOTTS, | |
| Defendant and Appellant. | |

APPEAL and cross-appeal from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

The McMillan Law Firm, Scott A. McMillan and Evan A. Kalooky for Plaintiff and Appellant.

Thomas/Lucas, Wayne D. Thomas, Timothy D. Lucas and A. Kerry Stack for Defendant and Appellant.

Plaintiff and appellant Kim Melanie Morton owns a dwelling in an older area of La Mesa. Starting in 2007, when the adjacent homeowner, defendant and cross-appellant Dana Spotts moved in, Morton and Spotts engaged in boundary and other disputes that gave rise to Morton's November 2008 complaint filed against Spotts on theories of quiet title, ejectment, trespass to land, slander of title, private nuisance, tortious interference with contract, and intentional infliction of emotional distress. The trial court heard two motions for summary adjudication on the quiet title issue, ultimately adjudicating in favor of Spotts that she had made an adequate showing that she did not dispute the state of title of Morton's property, thus effectively abandoning her previous judicial admission in her answer that there was "currently" a boundary dispute. (Code Civ. Proc., § 437c; all statutory references are to the Code of Civil Procedure unless otherwise indicated.) The court also granted a preliminary injunction preventing Spotts from approaching Morton on Morton's property or the immediate vicinity, except while on Spotts's own property or public areas.

The matter went to jury trial on the remaining causes of action. Regarding the claims for ejectment, slander of title, and tortious interference with contract (Morton's construction contract for a fence), the trial court granted Spotts's motion for nonsuit after Morton completed her case-in-chief. The jury then deliberated on three claims, and awarded compensatory damages to Morton on her theories of trespass to land ($5,519 economic loss) and private nuisance ($7,500 noneconomic loss). No award was made for her claim of intentional infliction of emotional distress. The jury further determined that Spotts's actions had been conducted with oppression, fraud or malice, justifying an award

of punitive damages. (Civ. Code, § 3294.) At the next stage of the proceedings, the jury awarded Morton $15,000 in punitive damages. Posttrial motions by both parties on these subjects were denied.

Morton appeals from the judgment, contending (1) the trial court mistakenly denied her motion for summary adjudication of the quiet title issue, while erroneously granting the cross-motion brought by Spotts; (2) the trial court erroneously granted Spotts's nonsuit requests on ejectment, slander of title, and tortious interference with contract. As we will show, Morton's appellate claims have no merit.[1]

In her cross-appeal, Spotts appeals the portion of the judgment awarding Morton punitive damages, asserting that insufficient evidence was presented to support a required element for such an award, i.e., that her net worth was adequate to pay such an award. (Civ. Code, § 3295, subds. (a)-(e).) We conclude the award of $15,000 punitive damages in the judgment is supported by sufficient evidence, on net worth and proportionality principles. (See *Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*); *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1187 (*Simon*).) The judgment will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

In her appeal, Morton does not challenge the amounts of the compensatory and punitive damages awards in the jury verdict, nor the finding against her on the emotional

---

1    The quiet title claim was alleged against both Spotts and her lender, Countrywide Home Loans, Inc., with the remaining claims only against Spotts. Defendant Countrywide's successor was dismissed and is not a party to this appeal.

3

distress claim, nor the denial of a permanent injunction.  Instead, she claims error only on the summary adjudication and nonsuit rulings, as they are reflected in the judgment.  It is also important to note that in her respondent's brief, Spotts acknowledges that she has had her day in court, and she accepts the jury's verdict on the trespass and nuisance theories, only cross-appealing to challenge the punitive damages award as excessive in light of the evidence presented about her net worth.

Accordingly, this statement of facts will provide a somewhat abbreviated timeline to explain the issues argued on appeal, concerning the rulings on the motions for summary adjudication, the nonsuit motions, and the validity of the challenged portion of the judgment awarding punitive damages.  More facts will be added as appropriate in the discussion portion of this opinion.

A.  Events Leading to Filing of Complaint;
"License" to Utilize Land is Granted and Disputed; Fence is Built

In January 2007, Spotts, a registered nurse and single mother, her two teenage sons and her young daughter moved into the house she bought at 4566 Acacia Avenue, La Mesa, California, immediately adjacent and alongside to Morton's house.  Morton is a high school English teacher who has lived alone in her house at 4572 Acacia Avenue since 1997, with her three cocker spaniels.  Shortly, the parties started to have difficulties in sharing the narrow side yard, common concrete planter box (the planter box) and the boundary between the two houses, which was partially marked by a white picket fence.  The two driveways are side-by-side and branch off of a common apron and parkway.

4

In early 2007, Spotts placed her trash cans and other items on Morton's property. At times, Spotts parked her car in front of Morton's property and garage and crossed Morton's driveway.

On August 9, 2007, Morton wrote and Spotts signed a letter (the "license") in which Morton allowed Spotts to build a lattice fence on the property line, and store her trash cans on a portion of Morton's side yard property. Morton then told Spotts the lattice fence poles were slightly inside the Morton property line, and asked her to move them, but she did not. Morton objected when Spotts rototilled the side yard, when Spotts overwatered plants in the planter box, and when Spotts's house's downspout let water flow onto Morton's property. Spotts complained about and/or threatened Morton's dogs. The parties argued over the lattice fence location and that of a yellow string being used to mark the boundary.

In January 2008, Morton sent a notarized letter to Spotts, telling her she could leave the lattice fence on Morton's property if, within four weeks, she removed the soil that she had added to the planter box. This was not done, and Morton sent another letter dated February 19, 2008: "You need to remove all of your effects, specifically trash cans, lattice panels and wooden posts, from my property. If you have not done so within two weeks, I will have your effects removed." The parties continued to disagree over plant care and whose plants were on whose property. Morton asked Spotts to tell her children not to throw objects into her yard and garage.

5

On March 17, 2008, Morton found that a concrete pillar marking the southern property line had been moved and rotated in such a way as to indicate that Morton's land lost about a foot along the border.

In March 2008, Morton hired Perry Construction Company (PCC) to construct a French drain and a wooden fence on her property. On March 17, 2008, PCC started the work, but stopped after Spotts's son told her the workers were on her property, and Spotts called the PCC office to complain. Spotts told PCC that the construction workers were trespassing on her land, and she threatened to call the police and sue the workers. After the work stopped, the gravel pile that had already been delivered sat in front of Morton's house for three months.

In April 2008, Morton hired a licensed surveyor, Karl Cebe (Surveyor Cebe), to locate and map the property line location, so the work could be finished. He placed boundary markers in the parties' shared side yard, and found the line Morton had been using was off by less than one inch. Surveyor Cebe showed Spotts the location of the boundaries and the markers, and she got upset, saying she thought her property went up to Morton's garage. Somebody moved one of the markers. The parties argued over things Spotts left around the boundary line areas (trash, plants, and stepping stones).

Morton renegotiated the PCC contract to comply with the survey results, without incurring further charges. In June 2008, Surveyor Cebe replaced a concrete and iron rebar survey marker that had been removed. Morton's counsel wrote to Spotts on

6

June 11, 2008, notifying her of the renewed fence building activity and offering to discuss the process and Morton's requests that Spotts move her plants.[2]

When PCC went back to work on June 16, 2008, Spotts again complained to the PCC office that the work permits were improper, and she parked her car in Morton's driveway, partially blocking the work. Spotts called the police, complaining she and her neighbor had a property line dispute. The fence was duly completed in June 2008, and PCC did not charge Morton extra for the delay.

Problems continued. On June 26, 2008, Ms. Morton discovered a crack in the new fence, and saw Spotts had glued some wooden objects (bees) onto the fence. On the evening of July 1, 2008, somebody threw a rock through Morton's kitchen window (10

---

[2] Spotts argued in her summary adjudication opposition and in her brief that the cordial tone of this letter suggests that the license Morton granted to her was ongoing up to and beyond the time of the fence building. The first summary adjudication was denied on that basis, but the next such motion was granted, and ultimately, the jury found no permitted access had continued, as shown by the trespass and nuisance verdicts for damages.

7

yards from Spotts's house).[3]  On July 14, 2008, somebody threw a brick at the wall near Morton's same kitchen window.[4]

On September 14, 2008, Spotts attached a string trellis to "her side" of the fence with screws, and painted Halloween decorations there.  Morton objected and Spotts said she could use her own side of the fence, but she painted over the decorations.

On September 17, 2008, Surveyor Cebe replaced a boundary marker that somebody had removed, but somebody then bent the 18-inch piece of rebar that was embedded in concrete, and redirected it favorably to Spotts.  The parties argued about the plants growing over the boundary, and Spotts called Morton names and suggested she stay inside if Morton did not "learn how to behave."  Spotts's teenage son made rude and threatening gestures at Morton and her dogs, such as pointing an air gun into her yard.

In November 2008, somebody shot out Morton's backyard surveillance camera with an air rifle.

In November 2008, Morton filed her complaint against Spotts to quiet title and for other relief, seeking an injunction and compensatory and punitive damages.  Morton

3    On July 2, 2008, Morton obtained a temporary restraining order (TRO) against Spotts in a civil harassment petition.  (*Morton v. Spotts,* San Diego Super. Ct., 2008, No. 37-2008-00065066-CU-HR-EC.)  (§ 527.6.)  This record contains the petition and the trial transcript of that hearing, and relief was denied.  Spotts separately obtained a TRO against Morton's counsel, but further relief was denied.  Evidence about both harassment TRO's was excluded at trial through rulings on motions in limine.

4    The jury verdict did not identify which incidents of nuisance or trespass Spotts had committed, but impliedly found at least one of each had been committed by her.  She does not contest the compensatory damages awards on appeal.  Here, we need not and do not attempt to identify who the "somebody" was, who was doing which alleged or proven acts of nuisance or trespass, as it is not necessary to our analysis.

alleged that before, during and after the fence construction, Spotts disputed title to both sides of the boundary line by doing such things as rototilling a portion of Morton's side yard over her objections, blocking access to Morton's property, moving boundary markers, and objecting to the fence work and boundary line used by the contractor PCC.

In January 2009, somebody shot out the lights and globe over Morton's front porch and patio, leaving broken glass and a BB on the front steps.

On January 10, 2009, somebody stuck an axe into Morton's fence. Morton noticed the same type of axe was next to Spotts's garage the next day.

B. Answer and Amended Answer Filed; Preliminary Injunction Granted

In propria persona, Spotts filed a verified answer on December 2, 2008, stating: "Defendant generally and specifically denies the property line is clear. Defendant admits that the property line is currently disputed."

Still acting in pro per in February 2009, Spotts filed an amended answer, again admitting that the property line was currently disputed. She responded to Morton's discovery requests, in relevant part by denying a requested admission that she "never had a valid claim of adverse possession as to any portion of the MORTON PROPERTY."

Shortly thereafter, Spotts retained an attorney and he discussed with Morton's attorney whether they could stipulate that Spotts would adhere to the boundary determination made by Surveyor Cebe. Spotts's attorney went on vacation and no stipulation was filed. Morton filed her summary adjudication motion on the quiet title issues on April 2, 2009.

9

In June 2009, Spotts put her trash cans and other belongings in the driveway and got in the way of the garage door, and Morton objected she was blocking it and called a friend for help. On June 16, Spotts painted a small yellow mark on the driveway curb. At trial, Spotts explained she painted this line after consulting with the city planning department, and said it was a navigation aid for parking her car. Somebody threw eggs at Morton's garage and yard and damaged the fence. On June 23, 2009, Morton sought and obtained a temporary restraining order against harassing conduct by Spotts.

On July 28, 2009, the trial court issued a preliminary injunction restraining Spotts from (1) entering onto Morton's property, (2) entering "upon the public property extending 18 feet immediately to the east-northeast of the property of plaintiff," i.e., the sidewalk and utility strip at the front of Morton's property, and a band of the Acacia Avenue roadway, a width of eight feet from the curb toward the center of the road and running parallel to the boundary of Morton's property. In summary, the preliminary injunction requires Spotts to refrain from parking, placing objects, standing, or intentionally causing any matter or substance to flow in front of Morton's property, and from using the sidewalk in front of the property, or placing any objects in that space, or blocking the driveway of Morton's property, although Spotts was allowed to travel immediately to or from her own property.

C. First Motion for Summary Adjudication: Morton

Although the attorneys for the parties had discussed in March 2009 whether Spotts would stipulate to Surveyor Cebe's boundary line being correct, no stipulation or amended answer was filed. In July 2009, Morton's motion for summary adjudication on

10

her quiet title claim was heard, arguing that Spotts was making an adverse claim, as admitted in her verified answer and discovery responses, but it was baseless. Morton filed her own declaration, an attorney declaration, and requests for judicial notice of the responses to the requests for admissions.

In opposition, Spotts argued there were triable issues about the scope of the license she had been granted to use Morton's property, and her declaration claimed she had been mistaken in making her verified answer and responses to discovery, about the state of the boundary dispute, because she did not understand the pleading process.

On July 10, 2009, the trial court denied Morton's motion for summary adjudication, due to triable issues remaining about the scope of the license Spotts had been granted to use Morton's property.

On September 18, 2009, this court summarily denied Morton's petition for a writ of mandate to reverse that ruling. (*Morton v. Superior Court* (Sept. 18, 2009, D055651).)

D. Second Motion for Summary Adjudication: Spotts

On December 31, 2009, Spotts filed her own motion for summary adjudication as to the quiet title claim. Spotts argued that Morton had failed to adequately identify what type of adverse claim that Spotts was making. In her declaration, Spotts stated that the only use she had made of the side yard had been permissive, according to her understanding of the license granted, so she did not understand what claim to title or adverse possession of Morton's property was being pursued. Spotts had not paid any property taxes for Morton or allegedly done anything other than minor, periodic, or transitory trespasses.

11

Spotts lodged amended discovery responses she had served in March and July 2009, that admitted that she did not have a valid claim of ownership as to the Morton property, but also stated that investigation and discovery were continuing. Similarly, these amended responses stated that she did not dispute the boundary Surveyor Cebe had established, although again, "investigation and discovery were continuing."

In Morton's opposition and separate statement, she provided declarations from Surveyor Cebe and an expert surveyor, Michael Pallamary, stating they had visited the site in February and March 2010, and found a boundary marker had been moved. Morton provided her own declaration with approximately 100 pages of photographic evidence about various stages of the dispute (dirt runoff on driveway, etc.). Morton filed a declaration from a representative of PCC, about the three-month delay in the fence construction project that occurred due to Spotts's telephoned objections. Morton also provided declarations from a real estate broker and a title expert, giving their opinions that her property might have lost value due to this litigation and boundary dispute. She sought judicial notice of Spotts's earlier discovery responses that failed to admit, as requested, that there was no current dispute about the location of the boundary line, and she objected to the later ones being provided, as contradictory.

In her separate statement, Morton admitted that she never pursued any adverse possession theory against Spotts, and that their earlier disputes about where the fence should be placed were essentially mooted by the work of Surveyor Cebe (i.e., since the previously "licensed area" is no longer accessible and is now blocked by the wooden fence, her title should be quieted as it now stands).

12

Morton claimed there were still triable issues on title, due to the lack of any confirmed stipulation to further amend Spotts's answers or responses, such as acknowledging that under section 761.030, subdivision (b), Spotts was formally disclaiming any title to Morton's property.[5]

On March 19, 2010, the trial court orally ruled upon the extensive evidentiary objections brought by Spotts to the declarations and audio-visual evidence of Morton and her experts (sustaining over 100 of the 138 brought). Morton had filed numerous evidentiary objections to Spotts's evidence, and most were overruled and some were sustained.

At the hearing, the judge emphasized that all of the evidence failed to show the current state of Morton's title was still being disputed, and Morton was not being prevented from going to trial on the claim for damages for trespass. The court granted Spotts's motion for summary adjudication.

E. Jury Trial, Nonsuit and Compensatory Damages Verdict

Jury trial began on June 28, 2010. Morton presented extensive testimony, including her own and Surveyor Cebe's, and testimony from La Mesa police personnel indicating there had been at least three calls to the site (although documentary evidence about the calls log was not admitted). Morton had no plans to sell, but feared her property had lost value due to the dispute. After a hearing under Evidence Code section

_____

[5]    Section 761.030, subdivision (b) provides:  "If the defendant disclaims in the answer any claim, or suffers judgment to be taken without answer, the plaintiff shall not recover costs."

13

402, the trial court excluded expert evidence of potential diminution in value of Morton's property, as offered by her real estate broker witness, Kay LeMenager.

On July 7, 2010, Morton rested her case. Spotts moved for nonsuit as to the claims for ejectment, slander of title, and tortious interference with contract. The trial court discussed the relationship of the summarily adjudicated quiet title claim, with those three causes of action, since none of them actually alleged there had been any formal challenge to Morton's title in the nature of a deed or other instrument that affected title. All three nonsuit motions were granted, and evidence of the attorney fees incurred by Morton was stricken, due to the lack of a cause of action to support them.

During trial, Spotts testified she did not understand the meaning of the answers or the discovery responses that she had filed while in propria persona, and as of July 2009, when her amended response to the requests for admissions were made, she now understood and accepted the boundary established by Surveyor Cebe. Spotts gave her version of the disputes, such as saying she could no longer clean up dirt from the planter box that leaked onto Morton's property, since she was told to stay away, and admitting that she owned a BB gun and might have been the only person in her house when Morton's light was shot out.

On July 12, 2010, the jury returned its verdict, awarding Morton $13,019 in compensatory damages on the claims of trespass and private nuisance, and making a finding that Spotts had acted with malice, oppression, or fraud.

That evening Spotts was deposed about her financial condition, to update partial information she had given in a February 2010 deposition about her bank accounts. The

14

next afternoon, when trial resumed, Spotts brought additional documents to court, including her paystub for the past five months, a rental receipt from a tenant of a condominium that she owned, bills for the condominium mortgage and HOA dues, and other financial data.

### F. Punitive Damages Verdict; Denial of Permanent Injunction; Appeal

At the punitive damage phase of trial on the afternoon of July 13, 2010, both parties testified, as did Morton's real estate broker, who gave her opinions about the value of the condominium property owned by Spotts. Following a day of deliberations, the jury awarded Morton $15,000 in punitive damages.

Next, Morton requested that the trial court extend the preliminary injunction already granted into a permanent injunction. According to Spotts's attorney, she was moving out shortly, due to her house being in foreclosure. On July 22, 2010, Morton's request for a permanent injunction was denied.

Each party filed motions for new trial, for judgment notwithstanding the verdict, or for remittitur. Morton filed a motion to vacate the court's equitable judgment that denied her a permanent injunction. Morton raised the issue of whether, since trial, Spotts had recently moved back into the house and cured the default on her loan, as suggested

by a copy of a rescission of the notice of default on Spotts's property, attached to an attorney's declaration.[6]

Each and every posttrial motion was denied as they relate to these issues, and they are not separately argued in this appeal and cross-appeal.  Morton timely filed her notice of appeal, and lodged her trial exhibits with the record.  Spotts filed a notice of cross-appeal.

## DISCUSSION

We will set forth the applicable standards of review in turn, as we discuss the propriety of the judgment and its underlying orders on summary adjudication and nonsuit.  We then address the cross-appeal's challenges to the validity of the judgment for punitive damages.  (Pt. III, *post*.)

### I

### *QUIET TITLE*

#### A.  Introduction and Contentions

To prevail on a motion for summary adjudication, a moving party defendant must establish that the plaintiff's cause of action is without merit, by negating one of its essential elements or by establishing a complete defense.  (*Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726-1727.)  The converse is also true, that a plaintiff must establish that all essential elements of the claim can be proven and no defenses apply.

---

[6]    In their briefs on appeal, the parties continued to dispute whether Spotts is currently living in the same house.  No such issues are currently before us and we decline to address any issues going beyond the current record, which ends at the posttrial motions, when that issue was still unresolved.

16

(*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) Summary judgment rulings are reviewed de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) We also review de novo the interpretation given to any statutes in the rulings. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.) To evaluate Morton's claims that the trial court's rulings on evidentiary objections were erroneous and prejudicial, we apply an abuse of discretion standard. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

In July 2009, the court denied Morton's motion to summarily adjudicate her cause of action to quiet title in her favor, because the court determined there were remaining triable issues about the scope of the license that she had granted to Spotts to use some of the boundary area.

By the time the second such motion, brought by Spotts, was ruled upon in March 2010, the court agreed with Spotts that Morton's title was not being placed at issue, despite her previous amended answer and discovery responses originally stating that the property line was in dispute. More recently, Spotts's amended discovery responses and declaration had formally disclaimed any title to Morton's property, although she still did not seek leave to amend her answer.

Based on the entire record, the trial court declined to find that Spotts's activities, as shown by Morton's declarations about her observations, amounted to making an "adverse" claim on title. In part, the court was relying upon the declaration Spotts filed in December 2009, stating that she accepted the Cebe boundary. The Spotts declaration claimed that her admission of an earlier "adverse interest" was actually a reference to the

17

license she was permissively granted, so that her amended answer otherwise was mistaken.

At argument on the motion, Spotts's attorney told the court "we have conceded on the issue of the boundary line." The court stated, "I don't look just to the complaint. I look at the evidence . . . [a]nd I have a right to look at the evidence beyond it."

On appeal, Morton argues the trial court failed to recognize that Spotts had made binding judicial admissions in her answer and discovery responses, that she was disputing the property line between the two houses, and her later declaration stating that she no longer contested the boundary line as drawn by Surveyor Cebe was insufficient to overcome those judicial admissions.

Morton further argues, "section 761.020 allows an owner such as Ms. Morton to quiet title to property *where there is any concern that an adverse claim may exist*. Ms. Morton merely sought a judicial decree that her property . . . was bounded according to the legal description in her grant deed . . . . Ms. Morton possessed a valid, properly recorded deed to the property . . . . Nobody, with the exception of Dana Spotts -- who lacked any evidence to back her wild claims, has disputed that the record of survey prepared by [Surveyor Cebe] accurately identifies the location of the boundaries in Ms. Morton's grant deed. No suggestion has been made that Ms. Morton's legal description of her property conflicts with Ms. Spotts' legal description in any manner. . . . Yet, Ms. Spotts was allowed to refute her prior verified pleadings and verified admissions and contradict her prior claims -- to obtain the court's order of summary adjudication." (Italics added.)

18

In response on appeal, Spotts argues that the trial court correctly determined that the type of activities that Spotts had admittedly conducted concerning the boundary dispute did not amount to actual challenges to title, and she had since conceded the Cebe boundary line was proper. She argues she did not pursue an adverse claim within the meaning of section 760.010 et seq.

To analyze the merits of these questions of law, as raised in each of the summary adjudication motions, we will outline the relevant statutory provisions and apply them to this record.

### B. Applicable Legal Principles

In this statutory scheme, section 760.010, subdivision (a) defines "claim" as including "a legal or equitable right, title, estate, lien, or interest in property or cloud upon title." "When two or more persons have adverse claims to the same property, any of the claimants may initiate a quiet title action. The purpose of the action is to eliminate an adverse claim and to establish, perfect or 'quiet' the title of the property in one or more of the claimants. The action is brought to determine adverse claims to land and not to declare the location of a boundary." (12 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 34:103, p. 34-367.)

Many such title disputes arise from loan documents, easements, inheritance, or otherwise competing documentary claims to title. "Actions to quiet title in the sense of removing a cloud are usually brought in the form of an action to cancel an instrument. The statutory quiet title remedy is cumulative and not exclusive of any other remedy, form or right of action, or proceeding provided by law for establishing or quieting title to

19

property." (53 Cal.Jur.3d. (2012) Quieting Title, § 1, p. 382, fns. omitted.) An instrument that creates an apparent or actual cloud on title may take the form of a note and trust deed reflecting an alleged obligation, a lien or mortgage, a tax deed, or a building restriction. (*Id.* at §§ 13-19, pp. 392-397, fns. omitted; see 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 654, p. 81.) The term "adverse" is one of art in this context. Adverse title claims do not usually consist of somebody's physically laying claim to a boundary portion of a neighboring property, unless adverse possession elements are also present. (See 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 212, p. 270.)[7]

In resolving a quiet title action, a matter of considerable significance to the parties, the trial court clearly acts as a fact finder and adjudicates issues, and it may be required to perform the function of a gatekeeper, such as resolving evidentiary objections. (*Harbour Vista, LLC v. HSBC Mortgage Services Inc.* (2011) 201 Cal.App.4th 1496, 1507-1508.) In order to recover in a quiet title action, the plaintiff must prove his or her title, as well as the existence of an "adverse" claim by the defendant. (§ 761.020, subd. (b); *Pacific States Sav. & Loan Co. v. Warden* (1941) 18 Cal.2d 757, 759; *Twain Harte Homeowners Ass'n v. Patterson* (1987) 193 Cal.App.3d 184, 188.)

"Title is not quieted as to boundaries, moving or otherwise; it is quieted as to legal interests in property. 'Such an action is brought, as authorized by the statute, "for the

---

7      "The action to quiet title is a proceeding in equity and there is no right to a jury trial. The proceeding becomes a legal action when it takes the character of an action in ejectment to recover possession of the property." (12 Miller & Starr, *supra,* Cal. Real Estate, § 34:105, p. 34-374.) We will discuss the ejectment theory in part II.B, *post.*

20

purpose of determining" any adverse claim that may be asserted therein by a defendant to the land in controversy; and this does not mean that the court is simply to ascertain, as against a plaintiff shown to have a legal interest, whether or not such defendant has some interest, but also that the court shall declare and define the interest held by the defendant, if any, so that the plaintiff may have a decree finally adjudicating the extent of his own interest in the property in controversy. The object of the action is to finally settle and determine, as between the parties, all conflicting claims to the property in controversy, and to decree to each such interest or estate therein as he may be entitled to. Of course, if the plaintiff fails to show any legal interest in the property in controversy, and as to which he asserts title, he must fail altogether, and could not complain of a judgment of nonsuit, but where he shows any legal interest, he is entitled to have that interest declared by the court. [Citations.]' (*Peterson v. Gibbs* (1905) 147 Cal. 1, 5.)" (*Lechuza Villas West v. California Coastal Commission* (1997) 60 Cal.App.4th 218, 242.)

## C. State of the Record

In support of her motion and in opposition to Spotts's motion, Morton provided a copy of her grant deed, supplemented by her declaration, and a declaration by Surveyor Cebe. Morton's complaint alleges that Spotts's actions, especially during the fence building controversy, constituted an "adverse" claim to title of the boundary strip, although Spotts did not offer a contrary property survey. However, Morton's separate statement admitted that the earlier dispute about where the fence should be placed is now essentially mooted by the work of Surveyor Cebe, in that the previously "licensed area" is no longer accessible and is now blocked by the wooden fence, so she requested that the

21

existing paper title should be confirmed in this action. Morton points to expert declarations she provided from a title expert, a surveying expert, and a real estate agent, that title disputes can devalue property.

In her briefs on appeal, Morton acknowledges that to the extent Spotts used the land by license, it was not an "adverse" interest. Notwithstanding any concessions, the record shows that even after the wooden fence was built in June 2008, many ongoing disputes between the parties existed, mainly concerning the driveway access issue. The record suggests that some portion of the driveway apron is public, as shown by language in the preliminary injunction stating that Spotts was allowed to travel immediately to or from her own property, but she shall not enter "upon the public property extending 18 feet immediately to the east-northeast of the property of plaintiff," i.e., the sidewalk and utility strip at the front of Morton's property, or the roadway eight feet out from the curb, running parallel to the boundary of Morton's property. Spotts was to refrain from parking, placing objects, standing or using the sidewalk in front of the property, or blocking Morton's driveway, etc. After trial, the court declined to make this preliminary injunction permanent, although the record is unclear if Spotts ever moved out, as she planned.

We therefore turn to the question of whether this record discloses, as an open question of fact or law, that Spotts (a) is bound by judicial admissions that she disputed the boundary area and therefore Morton's title to it, or (b) has otherwise asserted a claim that is legally and factually equivalent to a title challenge.

22

## D. Judicial Admissions

Spotts's February 2009 amended answer states, "Defendant generally and specifically denies that the property line is clear. Defendant admits that the property line is currently disputed." A judicial admission in a pleading, such as the amended answer, "is entirely different from an evidentiary admission. The judicial admission is not merely evidence of a fact; it is a conclusive concession of the truth of a matter and has the effect of removing it from the issues. Nor is a judicial admission treated procedurally as evidence; the particular pleading or allegation is not formally offered in evidence but may nevertheless be relied upon and treated in argument as part of the case." (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 98, p. 922; *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068, 1079-1080, fn. 10.)

On behalf of a client, an attorney can make a judicial admission or a concession for only one party, as in a brief or argument on appeal, even short of a stipulation or any formal agreement. (See 1 Witkin, Cal. Evidence, *supra,* Hearsay, § 101, pp. 925-927; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 704, pp. 773-774.) "And the same is true of a concession by counsel in the trial." (1 Witkin, Cal. Evidence, *supra,* Hearsay, § 101, p. 926.) Under the above definitions, after July 2009, Spotts arguably made additional judicial admissions in her moving papers and declaration and in her supplemental responses to requests for admissions, that unilaterally conceded the Cebe boundary line applies, and her attorney confirmed that position at the hearing.

The gist of this quiet title dispute seems to be whether the overall course of conduct by Spotts amounted to an adverse claim that denigrated Morton's title status. For

23

example, Spotts painted the yellow line on the curb in June 2009, and "somebody" damaged the fence on June 26, 2009. Declarations from the two surveyors say that they saw a survey boundary marker had been damaged in March 2010. Very little happened between the parties after the preliminary injunction was in place. We cannot condone the alarming conduct that took place, such as shooting and vandalism, but note that the jury did not clearly determine that Spotts was directly responsible for all of it.

It is an incomplete view of the record for Morton to focus solely upon the original February 2009 answer, amended answer and responses. Morton contends that the "phantom stipulation" counsel offered before the first summary adjudication motion, to abide by the line, was never finalized, and it was inadmissible as some kind of settlement offer. Even if this dispute does not qualify as an adverse possession case or one based upon any documentary title claims, Morton still argues that Spotts, as "one who makes use of another's property in derogation of the property owner's rights *is, by definition, an adverse user*." (Italics added.) She points out that the July 2009 amended answers stated they were subject to "further investigation." Her objections to that evidence were overruled at the motion hearing, which she claims was prejudicial error.

Spotts responds in her brief on appeal that she no longer disputes the property line drawn by Surveyor Cebe. Under the rules outlined above, this may amount to a binding judicial admission. However, the issues about any judicial admissions by Spotts, made after the motion hearing, have not been briefed, and we do not base our decision on that factor. We next address the evidentiary objections argued by Morton.

24

E.  Evidentiary Rulings Effect; Analysis

In its ruling, the court sustained many of Spotts's 138 objections to Morton's evidence, as based on "speculation, imaginations, guess work, or mere possibilities," or lacking relevance, or unduly cumulative.  (See *Doe v. Salesian Society* (2008) 159 Cal.App.4th 474, 481; Evid. Code, §§ 350, 352, 765.)  Many statements in Morton's and her witnesses' declarations about first hand observations of Spotts's conduct (arguing, blocking driveway, flooding property), as well as audio-visual evidence of confrontations at the site, were excluded, as irrelevant to the quiet title claim.

Morton also filed numerous evidentiary objections to Spotts's evidence, and some were sustained and some overruled.  Morton now argues that (1) all pleadings should have been considered, including her verified complaint, and (2) even if her excluded evidence was not necessary to prevail on the quiet title issue, it should still have been admitted in order to bolster and clarify other evidence she was offering on other theories.

At the summary adjudication stage of the proceeding, the trial court correctly understood that entitlement to relief under section 760.010 et seq. requires a different kind of an adverse claim than was being shown in this case, and that Morton was not facing any cognizable challenges to her own established title.  The court had discretion to resolve the evidentiary objections in determining whether triable issues existed, in a gatekeeper function in these motion proceedings.  (See *Harbour Vista, supra*, 201 Cal.App.4th 1496, 1507-1508.)

We find no abuse of discretion in the rulings sustaining the objections to most of the evidence that Morton provided, which was mainly cumulative evidence about

25

confrontations or speculation about possible future devaluation of her own property from such "adverse" claims. Such evidence was apparently intended to controvert Spotts's more recent admissions that the boundary line had been established. However, the court could properly evaluate all of the judicial admissions and evidence together and determine that Morton had failed to show that a concrete, legally cognizable, potentially harmful title claim was still being asserted by Spotts. Particularly in view of the equitable nature of the quiet title issues, the trial court did not abuse its discretion in sustaining the objections to her evidence.

This record does not demonstrate that an additional judicial declaration of title was necessary or proper, in view of the issues framed by the pleadings, the current state of title, and the types of actions that Spotts allegedly and/or actually conducted, which, although obnoxious, did not amount to an ongoing adverse or hostile claim of ownership of a boundary strip of Morton's land, as of March 2010 when the summary adjudication issues were heard. (See 1 Witkin, Cal. Evidence, *supra*, § 101, pp. 925-927.) The trial court was justified in narrowing the title issues presented, and the summary adjudication terminating the quiet title claim was correct as a matter of law.

II

*NONSUIT*

After Morton concluded her presentation of evidence, the trial court granted Spotts's motions for nonsuit on the grounds Morton had failed to establish the elements of three of her causes of action: ejectment, slander of title and tortious interference with contract. Morton challenges these rulings, contending the trial court erroneously failed to

26

recognize that she had presented sufficient expert opinion and nonexpert evidence from which a trier of fact could have found liability and damages.

We first set forth applicable nonsuit standards and then address the three sets of arguments separately.

## A. Standard of Review

When a trial court rules upon a motion for nonsuit, and determines whether a plaintiff's evidence is sufficient, " 'the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff ['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff ['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).)

In evaluating the record on appeal, the test for reviewing a nonsuit order "is whether, if all legitimate inferences favorable to plaintiff are made, the evidence is sufficient to support [the challenged] claim. . . ." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118 (*Campbell*); *Nally, supra*, 47 Cal.3d at p. 291.) "The plaintiff must be given an opportunity to present all the facts he expects to prove before a nonsuit is proper." (*Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 273; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.)

27

" 'It is not incumbent upon a plaintiff to show that an inference in his favor is the only one that may be reasonably drawn from the evidence; he need only show that the material fact to be proved may logically and reasonably be inferred from the circumstantial evidence.' " (*Campbell, supra,* 32 Cal.3d 112, 121.)

## B. Ejectment

### 1. Applicable Legal Principles

Classically, the theory of ejectment requires proof of "seizin, entry and ouster," such that limited or temporary trespasses by the defendant do not suffice. (*Wilson v. Diche* (1961) 192 Cal.App.2d 312, 314-315; see *Abar v. Rogers* (1972) 23 Cal.App.3d 506, 514-515.) However, if the trespasses are of a continuing nature, they can establish that the defendant ousted the plaintiff of possession, by withholding a portion of the plaintiff 's property. (*Ibid*.; *Frazier v. Lynch* (1893) 97 Cal. 370, 373.)

### 2. Morton's Evidence

Morton relied on evidence of Spotts's activities before the fence was built, such as placing trash cans in the border area, and afterwards, such as overwatering plants and allowing water to flow from a downspout onto Morton's property. Morton admits that Spotts did not oust her from the entirety of Morton's property, and argues she made out a prima facie case of Spotts's unlawful occupation of some portions of her land, damaging her.

In argument on the motion, defense counsel pointed out that the undisputed evidence showed that as of the time the lawsuit was filed, Spotts was not in possession of

28

any part of Morton's property, and therefore, any occasional, transitory trespasses shown did not justify sending the case to the jury on the ejectment theory.

### 3. *Ruling; Application of Standard of Review*

The trial court concluded that on the state of the evidence, Spotts was entitled to nonsuit. The type of evidence on which Morton was relying properly went to the trespass theory, or some less severe interference with her possessory rights.

The trial court correctly analyzed the undisputed evidence as failing to show that Spotts had consistently and substantially entered the property in a way that actually possessed it, to the exclusion of Morton from her part of the boundary area. (*Wilson v. Diche*, *supra*, 192 Cal.App.2d 312, 314-315.) On this record, the court was justified in not sending the ejectment claim to the jury.

## C. Slander of Title

### 1. *Applicable Legal Principles*

"Slander or disparagement of title occurs when a person, without a privilege to do so, publishes a false statement that disparages title to property and causes the owner thereof ' "some special pecuniary loss or damage." ' [Citation.] The elements of the tort are (1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss. [Citations.] If the publication is reasonably understood to cast doubt upon the existence or extent of another's interest in land, it is disparaging to the latter's title. [Citation.] The main thrust of the cause of action is protection from injury to the salability of property [citation], which is ordinarily indicated by the loss of a particular sale, impaired marketability or depreciation in value [citations]." (*Sumner Hill*

29

*Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1030 (*Sumner Hill*) [where plaintiff's title was disparaged in a recorded instrument].) " ' "Pecuniary loss" ' is an essential element of a slander of title cause of action." (*Ibid.*)

In *Appel v. Burman* (1984) 159 Cal.App.3d 1209, 1214-1215, the appellate court found that the trial court's judgment was supported by substantial evidence, that the defendants had falsely and maliciously published to third parties their own claim of an "agreed upon boundary," but only as an excuse to prevent the plaintiffs from constructing their improvements for as long as possible, and "without any sincere belief that [defendants/appellants] had any right, title or interest in the [plaintiffs/respondents'] property." (*Id.* at p. 1214.) One of the third parties, the public agency department of water and power, consequently refused to move a power pole, which resulted in damages being incurred by the plaintiffs and others. "Since the publication of this falsehood was found to be with malice, it could not be privileged. As discussed, *infra*, the malicious publication did result in pecuniary loss," from the plaintiffs' consequent inability to proceed with their improvements. (*Id.* at p. 1215.) The loss from the two-year delay in the plaintiffs' construction of their project, that was attributable to the disparagement, amounted to $34,901. (*Ibid.*)

### 2. Morton's Evidence

Morton relied on evidence of Spotts's communications to the PCC owners, both in March and June 2008, complaining that its workers were trespassing upon Spotts's property, and claiming that its license should be revoked. Morton argues there was circumstantial evidence that it was Spotts who parked in the driveway or moved

30

boundary markers, thus attempting to claim Morton's property, at least through July 2009, when she finally accepted the property line. Morton thus contends that she has shown the required elements of publications that disparaged title but were false and unprivileged.[8] As proof of her pecuniary loss, she cites to evidence of her attorney fees and the three-month delay in completing the fence, after she incurred expenses in hiring Surveyor Cebe. She also suggests that her house may have lost value due to the boundary dispute, although evidence of appraisals was excluded.

In argument on the motion, Spotts's attorney argued that there had been no false claims of assertions of title to *Morton's property*, insofar as Spotts had complained to PCC workers and owners that they were trespassing upon the *Spotts property*. Spotts therefore contended that was a true and defensible claim of trespass against her. Likewise, Spotts argues that none of her publications made to the PCC owners or to the surveyor were shown to be a disparaging attack on Morton's title, but rather amounted to a defense against incursions upon her own property. Spotts further argued that the previous summary adjudication ruling was proper, it established there was no title dispute, and therefore there was no slander of title dispute sufficiently proven to go to the jury.

---

[8]     Morton's brief asserts, without support, that the trial court adopted the reasoning offered by Spotts that she might be entitled to some qualified privilege defense under Civil Code section 47, subdivision (c). Although the parties discussed at the time the motions were heard whether Spotts might be offering jury instructions on privilege, the court's nonsuit ruling does not show any reliance on privilege contentions. We need not address any privilege issues here, in view of the failure of proof on other elements of the slander of title claim.

31

### 3. Ruling; Application of Standard of Review

In making its ruling, the court distinguished the case of *Appel v. Burman*, *supra,* 159 Cal.App.3d 1209, relied on by Morton, by stating that it involved a more extensive disparaging publication to a third party governmental agency, that directly invoked a title challenge and caused the plaintiff pecuniary loss from a two-year delay in construction. The trial court concluded Spotts was entitled to nonsuit, because Morton's evidence did not adequately establish the elements of a false or harmful publication to third parties that caused her pecuniary loss. There was no challenge in the nature of a deed or other instrument that otherwise affected title, as previously established in the ruling granting summary adjudication.

This analysis was correct. Morton's evidence failed to show that the publications made by Spotts could be "reasonably" understood as casting doubt upon the existence of Morton's interest in her own side yard. (*Sumner Hill*, *supra*, 205 Cal.App.4th 999, 1030.) The circumstantial evidence Morton presented did not "show that the material fact to be proved may logically and reasonably be inferred from" that evidence. (See *Campbell, supra,* 32 Cal.3d 112, 121.) On this record, the jury was not required to make a decision upon the asserted facts about alleged false and unprivileged slanders directed at Morton's title.

### D. Tortious Interference with Contract

### 1. Applicable Legal Principles

To establish a case for the tort of intentional interference with a contract, a plaintiff must prove the existence of "(1) a valid contract between plaintiff and a third

32

party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 (*Quelimane*).)  The tort of intentional interference with performance of a contract does not require that the actor's "primary purpose" be disruption of the contract.  (*Id*. at p. 56.)

In *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1155, footnote 7 (*Korea Supply*), the court adhered to the analytical approach set out in *Quelimane*, for the current state of the law concerning the intent requirement for the tort of interference with contract.  Specifically, *Quelimane, supra,* 19 Cal.4th at page 56 determined "that intentional interference with contract does not contain a specific intent requirement."  (*Korea Supply, supra*, at p. 1155, fn. 7.)

*Korea Supply* further states that the intent requirement is the same for the torts of intentional interference with contract and intentional interference with prospective economic advantage, but those torts nevertheless remain distinct:  " '[o]ur courts should . . . firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant.' "  (*Korea Supply, supra*, 29 Cal.4th 1134, 1157, quoting *Della Penna v. Toyota Motor Sales U.S.A., Inc.* (1995) 11 Cal.4th 376, 392.)

33

## 2. *Morton's Evidence*

Morton's evidence addressed whether Spotts had intentionally committed acts to disrupt Morton's contractual relationship with PCC, causing her damage. It was not disputed that Spotts had twice called PCC owners to complain about the fence project, nor that there was a three-month delay in completion, nor that Surveyor Cebe was hired to clarify the situation. As damages, Morton cites to the evidence that she "had to suffer with gravel in her front yard for three months," and "in order to avoid further conflict with Ms. Spotts, the workers excavated the area by hand and built the fence backwards, which increased the hours it took to complete the project once work re-commenced." She argues the jury should have been allowed to determine the weight of the inferences, from such evidence, of intentional interference and harm.[9]

## 3. *Ruling; Application of Standard of Review*

In making its ruling, the trial court referred to previous arguments heard on the same type of issue, and then concluded that Spotts was entitled to nonsuit. Morton could not show the element of damage to her from Spotts's threats toward PCC of potential legal actions for trespass or license revocation (which never occurred and did not harm Morton). Morton was not charged extra for the moderate delay in performance of the contract, which was done according to the correct boundary line, and she could not show

---

[9]     The majority in *Korea Supply, supra*, 29 Cal.4th 1134 at pages 1155 to 1156, declined to rely on *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752 (overruled on other grounds in *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 88), as authority for establishing the intent requirement for the tort of intentional interference with contract. Morton cannot persuasively rely on *Seaman's* authority in this context to claim she adequately proved the necessary bad intent.

how the mere existence of delay, such as the gravel pile on her driveway, damaged her. The record demonstrates that even if Morton's evidence is accepted and viewed in the light most favorable to her, the plaintiff, and if every inference is indulged, it still lacks essential elements of this particular claim. (*Castaneda v. Olsher, supra*, 41 Cal.4th 1205, 1214.)

In conclusion, we agree with the trial court that the evidence produced by Morton was insufficient to justify the necessary reasonable or logical inferences of causation of damage from Spotts's activities, on these three theories, and the nonsuit ruling was proper. The trial court conscientiously addressed each and every argument about the elements of these claims, and we cannot find any error in the grant of nonsuit on these theories.

III

*CROSS-APPEAL: PUNITIVE DAMAGES AWARD*

Morton was awarded $13,019 in compensatory damages on the claims of trespass and private nuisance. Once the jury determined that Spotts had acted with malice, oppression, or fraud, trial was adjourned for financial discovery to take place, and the bifurcated punitive damages phase resumed the next day. Apparently, no detailed discovery had been attempted previously, in light of in limine rulings restricting evidence of Spotts's financial condition, and the restrictions of Civil Code section 3295, which

limit the circumstances under which evidence of a defendant's financial condition may be discovered and admitted.[10]

In her cross-appeal, Spotts argues that the $15,000 award of punitive damages was excessive in light of the evidence presented about her financial condition. She claimed at trial she had a negative net worth, due to her various ongoing obligations. We examine this argument in light of accepted rules for reviewing punitive damages awards.

A. Applicable Legal Principles

Generally, a contention of insufficient evidence to support a punitive damages award is considered under a substantial evidence standard of review. (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916 (*Kelly*).) "[A]ll presumptions favor the trial court's findings and we view the record in the light most favorable to the judgment." (*Ibid*.; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1536, fn. 10 (*Vallbona*).) We should reverse " ' "only those judgments which the entire record . . . indicates were rendered as the result of passion and prejudice. . . ." ' " (*Kelly, supra*, at p. 916; *Neal v. Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 927-928 (*Neal*).)

Punitive damages awards must take into account the reprehensibility of the defendant's conduct, and bear a reasonable relationship to the jury's findings on the harm suffered by the plaintiff. (*State Farm v. Campbell* (2003) 538 U.S. 408, 418 (*State Farm*); *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 575; *Simon*, *supra*, 35

_____

10    Spotts was deposed in February 2010 and gave some testimony about her bank accounts and credit card accounts and assets. However, there was apparently no pretrial request for leave to conduct further financial discovery under Civil Code section 3295.

Cal.4th at p. 1172.)  As most relevant here, an award of punitive damages must comport with the evidence presented about the defendant's financial condition, to represent "the amount necessary to punish him or her and discourage future wrongful conduct."  (*Kelly, supra*, 145 Cal.App.4th 910, 914.)

The "most important question is whether the amount of the punitive damages award will have deterrent effect--without being excessive."  (*Adams, supra,* 54 Cal.3d at p. 111.)  Such an award must be in a reasonable range with respect to both the nature of the misconduct and the amount of compensatory damages, and it may not be so disproportionate to the defendant's ability to pay that the award becomes constitutionally excessive.  (*Ibid.*; *Neal, supra*, 21 Cal.3d 910 at pp. 927-928.)  There is no bright line rule that sets the proper ratio of compensatory to punitive damages, but this ratio "should generally be no higher than four to one and almost never more than nine to one."  (*Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 213 (*Gober*), citing *State Farm, supra*, 538 U.S. at p. 425.)

The plaintiff has the burden to establish the defendant's financial condition, by introducing evidence to support an award of punitive damages that is appropriate in amount and not excessive "in light of the central goal of deterrence."  (*Adams, supra,* 54 Cal.3d at p. 120.)  The courts acknowledge that it "is inherently prejudicial to require a defendant to introduce evidence of personal finances."  (*Ibid.*; see *Kelly, supra*, 145 Cal.App.4th 910, 920.)

In light of these rules, it is essential for a plaintiff to present actual evidence of the defendant's financial condition as of the time of trial.  (*Kelly*, *supra*, 145 Cal.App.4th at

p. 915; *Adams, supra*, 54 Cal.3d at p. 116, fn. 7, 119; *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839; *Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777.)  In *Kelly*, we alluded to the concept expressed in *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1065, footnote 3 (*Lara*), that " '[n]et worth' is subject to easy manipulation and, in our view, it should not be the only permissible standard." (*Kelly, supra*, at pp. 915.)  For example, in *Vallbona, supra,* 43 Cal.App.4th 1525, it was sufficient that the defendant made certain admissions about his financial condition, and further testified about real estate ownership and net value, as well as other assets.  (*Id.* at p. 1539.)

Thus, any examination of assets in this context without adding an examination of liabilities would be inadequate.  (*Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 57.) "Without evidence of the entire financial picture," there was a risk of "crippling or destroying the defendant."  (*Ibid*.)  Even if a defendant is wealthy, his or her debts may be high, and cannot be ignored.  (*Id*. at p. 58.)

### B.  Morton's Evidentiary Showing

The evening after the first jury verdicts were rendered, Spotts submitted to an hour-long deposition about her financial condition.  The next afternoon, when trial resumed, Morton's counsel made an opening statement requesting treble damages over the $13,000-plus compensatory damages award.  He stated that the evidence would demonstrate Spotts had at least $200,000 in assets and, as a registered nurse, she was capable of earning at least $70,000 per year.

38

At trial, Spotts testified about her income and expense statements and settlement documents in her 2006 dissolution of marriage (her third), which had been litigated over the past few years. She had received over $150,000 in assets and $34,000 of her children's college accounts, as well as a final $62,000 settlement in 2010. Spotts previously had a $100,000 investment account from her third marriage. She testified it was all gone now. She had spent about $220,000 in attorney fees during the divorce litigation. She was receiving $707 per month from her second husband's pension. She had a tax refund coming in the amount of $2,500.

Spotts testified that she owned a condominium in La Mesa that she rented out, and she currently owed approximately $144,000 on it. She received below market rent on it, to accommodate the financial needs of her tenant. Its market value was estimated at $140,000 by Spotts, and at $175,000 by Morton's real estate broker and witness, Kay LeMenager.

Since 2007, Spotts had been working full time or per diem or part-time as a registered nurse, making about $1,250 per week. As of her previous deposition in February 2010, she was working sporadically, but at the time of trial, she could no longer do so, because of debt.

Morton's counsel asked Spotts about permits she had obtained and paid for, involving a planned renovation of her current home, which had been designated as a historic residence, but she stated that she was no longer pursuing it because of lack of finances. She was living in a rental house in Mission Hills for $2,000 per month, because she did not want to displace her La Mesa renter.

Spotts's own attorney then questioned her about the additional documents she had just brought to court, including a pay stub for the past five months, which showed she was paying $400 monthly child support for her teenager. It showed she had earned about $27,000 gross year-to-date, and her net pay was approximately $3,520 monthly. She had approximately $200 in each of two credit union accounts. Her investment account now had $1.41 in it. Her bank statements showed she had about $5,000 in a savings account as of July 12, 2010.

Spotts testified that the subject Acacia residence was currently in foreclosure and was to be sold at auction the next month, and the mortgage amount due was currently $360,000. It was valued at $250,000. Her La Mesa condominium had a mortgage balance of $140,000 with a monthly payment of $1,001 per month, and she was underwater on both properties. She also paid homeowners' association dues, property taxes and insurance for the condominium, and the rent she received did not cover those amounts. She supplied her cell phone bill for work ($222 per month), and stated her monthly expenses also included $300 for utilities and $400 for food for herself and any visits from her children. She owned a car for which she paid $5,000 in cash, and she spent about $200 per month on car expenses. She testified she had a negative cash flow every month.

On cross-examination, Morton's counsel asked Spotts why she had not disclosed the newly produced material previously, and she said she did not understand the deposition questions. She was receiving compensation for her mileage driven for work and had high seniority at work, so she could get jobs before her less senior colleagues

could. Her compensation was "complicated" and she made different amounts for meetings, as opposed to other kinds of work. The court did not allow Morton's attorney to inquire into Spotts's personal insurance coverage that might apply to the compensatory damages award against her.

Morton's real estate broker witness gave her opinions about the rental value of the condominium property owned by Spotts, i.e., about $500 more than Spotts was charging her tenant.

Morton testified about the money she had spent on this litigation and how Spotts had mocked her on that topic and others. Morton's attorney explained to the jury that more discovery had not been done earlier because of financial privacy concerns, and that until the essential jury finding of liability for punitive damages had been made, Spotts's deposition had to be delayed. He said he had obtained as much information as he could, once the verdict was presented.

In argument on the punitive damages issues, Morton's attorney said Spotts's net worth was about $351,000 and a $39,000-$40,000 punitive damages award would be proper and would not wipe her out, and would send her and the community a message about how not to act. On appeal, Morton contends the evidence showed Spotts had at least $264,000 in assets.

Spotts's counsel argued to the jury that she had shown she had a negative cash flow, of $5,300 per month in expenses and about $4,000 per month in income. The Acacia property was currently worth about $250,000, and overall, Spotts's financial condition was poor and she did not need to be taught a lesson.

The jury deliberated for a day and awarded $15,000 in punitive damages.

## C.  Analysis

The concept of " '[n]et worth' is subject to easy manipulation.' " (*Lara, supra*, 13 Cal.App.4th at p. 1065, fn. 3.)  This concept is also discussed in terms of financial condition or a "defendant's ability to pay." (*Adams, supra*, 54 Cal.3d at pp. 110-116.) Whatever terminology is used, we are persuaded that substantial evidence was presented to present a fairly complete picture, in the punitive damages context, of Spotts's assets, liabilities, and ability to earn.  Even though she repeatedly asserted she had a negative net worth, in terms of monthly cash flow, she also revealed that she had assets that were not being fully utilized.  The financial choices that she had made could reasonably have been evaluated by the jury as failing to maximize her net worth or to improve her financial condition.  More than just Spotts's divorce financial settlement information was shown at trial.  Counsel argued and the jury was instructed on the relevant factors to apply.

This is not a case in which the jury lacked any information about liabilities, or was presented with only one side of the financial ledger sheet.  (*Kelly, supra*, 145 Cal.App.4th at p. 920; *Kenly v. Ukegawa, supra*, 16 Cal.App.4th 49, 57.)  Rather, Spotts had the opportunity to explain her monthly income and outgo as they affected her financial condition, and she also testified about her real estate ownership and its net value, as well as her other assets, income, and obligations.  (*Vallbona, supra*, 43 Cal.App.4th at p. 1539.)

This jury was given an adequate basis to award punitive damages, and it did not do so in a disproportionate manner that suggests only passion or prejudice could have been

42

its rationale.  (*Neal, supra*, 21 Cal.3d 910 at pp. 927-928.)  This record supports the award and amount of punitive damages in the judgment, as well as the underlying liability findings and legal rulings.

## DISPOSITION

The judgment is affirmed.  Each party shall bear her own costs on appeal.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.