Filed 7/13/23  N.M. v. CHCM CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| N.M. SON,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CHCM, INC.,<br><br>    Defendant and Respondent. | G061035<br><br>(Super. Ct. No. 30-2020-01145245)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

N.M. Son, in pro. per., for Plaintiff and Appellant.

Pleiss Sitar McGrath Hunter & Hallack and Larry T. Pleiss for Defendant and Respondent.

\*          \*          \*

N.M.,[1] a minor at the time of the events in question, appeals from the trial court's entry of judgment against him on his claims of medical malpractice and false imprisonment after the court granted summary judgment in favor of CHCM, Inc., a healthcare provider (Code Civ. Proc., § 425.13, subd. (b)) doing business as College Hospital Costa Mesa (CHCM). Doctors and staff at the hospital had placed or maintained a mental health hospitalization hold on N.M. following student reports made to N.M.'s high school that he allegedly posted a threat on social media to shoot up the school. While N.M.'s brief indicates he has gone on to academic success pursuing premedical studies in a university degree program, and his opposition to summary judgment included his emphatic denial that he made any threat, his opposition did not identify any evidence known to hospital staff or doctors to create a triable issue of fact undermining their showing of probable cause to detain N.M. for continued evaluation and treatment. We therefore affirm the summary judgment ruling.

### FACTUAL AND PROCEDURAL BACKGROUND

N.M. and N.M. Dad filed their complaint in May 2020. After several rounds of pleadings, including demurrers the trial court sustained as to most of the plaintiffs' causes of action, CHCM and two doctors individually named by N.M., Gail Ross (Ross) and Michael D. Schwartz (Schwartz), each eventually sought summary judgment on the remaining claims for medical malpractice and false imprisonment.[2]

---

[1] N.M. is usually referred to in the trial record as "N.M. Son" to distinguish him from his father, "N.M. Dad," who did not file a notice of appeal. (Cal. Rules of Court, rule 8.100(a)(1).)

[2] Ross's and Schwartz's motions for summary judgment proceeded in parallel with CHCM's motion, but resulted in separate judgments, which N.M. also appealed. That appeal is resolved on virtually identical grounds in *N.M. Son v. Schwartz et al.* (G061325, July 13, 2023) [nonpub. opn.]).

According to CHCM's separate statement of undisputed facts submitted in support of summary judgment, a police officer filed an application for N.M. to be evaluated for a hold and treatment at CHCM after school authorities notified the police department of a report that N.M. posted statements on his social media "discord" account that he would shoot up the school, among other threats. Hospital records indicated the officer, who was authorized to commence an initial detention for purposes of a mental health evaluation when a person presents a danger to himself or others (see Welf. & Inst. Code, § 5150, subd. (a)), determined an evaluation was necessary based on the threat described by the school and his interview with N.M.[3]

According to the officer's account, N.M. claimed he posted the threats as a joke, disclosed a prior depression diagnosis, and described himself as suffering from body dysmorphia, apparently in relation to his thinning hair. Hospital staff evaluated N.M. on May 18, 2019, and made an initial determination he met the criteria for a hold; Schwartz evaluated N.M. the next day.

Schwartz noted the alleged threats, N.M.'s depressed mood, impaired insight and judgment, and his statement that a medication for major depressive disorder (Trintellix) had "helped" him in the past. Schwartz diagnosed N.M. with major depression and anxiety and, noting "suicidal ideation" and "impaired level of functioning," he concluded continued hospitalization was necessary. Schwartz cautioned that discharge could "exacerbate his illness, depression[,] anxiety[,] and needed medication stabilization."

---

[3]       Welfare and Institutions Code section 5585.50 is the analogue to section 5150 for minors. The officer filed his application pursuant to section 5585.50.

       For brevity, our further citations to the Welfare and Institutions Code are shortened to WIC or left undesignated if the context is clear.

3

Two days later, on May 21, 2019, Schwartz spoke with N.M.'s mother, father, and uncle. They informed him N.M. had been prescribed Trintellix in January that year, was non-compliant in taking it or a Prozac prescription, his preoccupation with his appearance included threats of self-harm, and he had a recent history of outpatient and partial inpatient mental health treatment.[4]

On May 23, 2019, Schwartz spoke with the psychologist at N.M.'s school, who reviewed with him the postings "describing a desire to potentially harm people at school," and N.M.'s allegedly "paranoid thoughts, especially about [his] mother." That same day, according to Schwartz's account in his summary judgment separate statement of undisputed facts, N.M. Dad came to the hospital "demanding to take [N.M.] home," but Schwartz maintained N.M.'s continued hospitalization was necessary under WIC section 5250.

In his opposition N.M. did not identify any evidence to rebut Schwartz's conclusion or to suggest that N.M. Dad conveyed information to Schwartz which might cause him to reconsider a continued hold. N.M. claimed the school psychologist "never made the above statements," but offered no evidence such as a declaration or other admissible evidence to support his assertion. Instead of evidence, N.M. lodged only his hearsay and foundation evidentiary objections.

This pattern continued throughout the remainder of the summary judgment moving papers and opposition. On May 25 and 26, Ross evaluated N.M. as the coverage physician in Schwartz's absence. She found he had a flat blank affect, "cannot moderate impulsivity reliably," lacked empathy, and displayed narcissistic traits. N.M. presented as "pseudo-mature entitled," with "fragile self-esteem," a "poor vocabulary for feeling

---

[4] N.M.'s opposition to summary judgment offered no facts in his separate statement to rebut this evidence; instead, he argued Schwartz relied on "Inadmissible Hearsay" and he asserted a legal challenge, "Lacks Foundation." We address these contentions below in relation to expert opinion evidence.

words," and "no age-appropriate social skills." Ross found him "not safe for discharge" because he posed "a risk of harm to others."

In response, N.M.'s separate statement offered no contrary evidence; instead, he argued Ross's assessment was not "proof of [him] being a danger to himself or others." N.M. asserted Ross "erroneously diagnosed 12 major mental health illnesses," which, without reference to a contrary expert opinion or citation to any evidence in the record, N.M. claimed "is a world record for any patient and is unrealistic." N.M. levied legal attacks on Ross's evaluations as "Inadmissible Opinion," "Improper Legal Conclusion," and "Lacks Foundation."

Schwartz reevaluated N.M. daily for the next five days, from May 27 through June 1, 2019, and his assessment remained unchanged: "still a danger to others, paranoid, anxious and impaired insight and judgment." Schwartz's diagnoses included "major depression, rule out psychosis, body dysmorphic diagnosis; rule out OCD, DTO GD (danger to others, gravely disabled)." His final diagnosis was "severe major depressive disorder with psychosis," with a prognosis of "guarded" and his stressors "moderate."

In his separate statement of disputed or undisputed facts in opposition to summary judgment, N.M. did not cite or reference any declarations or documentary or testimonial evidence of any kind, with two exceptions. Disputing Schwartz's final diagnosis, N.M. contended he "should not have been held more than one day" because he "never had 'severe depression or psychosis.'" N.M. suggested that his amended complaint "already has two expert doctors that testify to this."

N.M. had attached to his amended complaint two letters apparently written after his release from the hospital. Neither letter was in the form of a declaration. One letter appears to have been addressed to N.M.'s parents by an individual self-identified as having a Ph.D. in psychology. The author of the letter stated that in July 2019, a month after N.M.'s release from the hospital, he administered psychological tests to N.M. in

5

which N.M.'s scores "did not reflect a personality disorder," but only "generalized anxiety." The author also stated that his "individual interviews with [N.M.] did not suggest the presence of a psychotic process."

The other letter, addressed to "To whom this may concern" in February 2020, approximately eight months after N.M.'s release from the hospital, identified the author as an "M.D., FAPA." The letter stated in relevant part: "[N.M.] has been a patient of mine for the last two years. In accordance with our extensive evaluation[,] he is not psychotic. He is diagnosed with F32.2 and F41.0." N.M. did not suggest or provide evidence in his separate statement that he or N.M. Dad or anyone else shared this doctor's conclusions with CHCM, Ross, or Schwartz at the time they were treating him.

Returning to the timeline of treatment that CHCM established in its separate statement of undisputed facts, Schwartz evaluated N.M. on June 3, June 4, and June 5, 2019. His assessment remained the same: "still a danger to others, paranoid, anxious and impaired insight and judgment." Schwartz planned to continue the current treatment plan with therapy and medications, including Trintellix. On June 3, Schwartz noted he spoke to N.M.'s mother "the previous night about starting an antipsychotic [medication to] which she continued to refuse consent."

Schwartz's notes on June 4 reflected that a "Writ" hearing "was set for June 6."[5] Following the habeas hearing, the superior court ordered N.M.'s release from

_____

[5]    WIC section 5254 provides that a person detained on a 14-day hold under section 5250 is entitled to an administrative "certification review hearing" or judicial review, and WIC section 5270.15 *requires* the administrative hearing or habeas corpus judicial review under WIC section 5275 when, as here, the hold is extended beyond 14 days to up to 30 days. (WIC, § 5270.15, subd. (b).) Section 5275 provides: "Every person detained under this part shall have a right to a hearing by writ of habeas corpus for their release after they or any person acting on their behalf has made a request for release."

the hospital.  N.M. did not include the release order in the record on appeal or a transcript, settled statement, clerk's transcript, exhibits, or any other documentation or evidence from the habeas proceedings, and does not appear to have included any such evidence in his opposition to summary judgment.  His separate statement does not identify or refer to any evidence of any kind from the habeas hearing.[6]

The trial court granted CHCM's motion for summary judgment, and N.M. now appeals.

**DISCUSSION**

1. *Standard of Review*

A motion for summary judgment is properly granted if the moving papers establish there is no triable issue of material fact, and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc.,[7] § 437c, subd. (c).)  We review a trial court's decision to grant summary judgment de novo.  (*Nava v. Saddleback Memorial Medical Center* (2016) 4 Cal.App.5th 285, 289.)

When a defendant moves for summary judgment, the defendant has the initial burden of presenting evidence sufficient to establish either that the plaintiffs cannot prove one or more elements of their causes of action, or that there is a complete defense.  (§ 437c, subd. (p)(2); *Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 889.)  If the defendant does so, the burden then shifts to the plaintiffs to produce admissible evidence demonstrating there is a triable issue of material fact as to the claim or defense.  (§ 437c, subd. (p)(2); *Carlsen*, at p. 889.)  "'[T]o meet that burden, the plaintiff "may not rely

---

[6]     Our review of the lengthy appellate record discloses only N.M.'s petition in the superior court for a writ of habeas corpus and the court's appointment of the public defender in the matter.  N.M.'s petition requested as the grounds for his petition for release a determination that he "is not gravely disabled; is not a danger to others."

[7]     All further undesignated statutory references are to the Code of Civil Procedure, unless specified otherwise or the context makes the cited code clear.

upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . .”’” (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 274.) Claims or theories advanced to thwart summary judgment that are not supported by evidence will not raise a triable issue. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163, 166 (*Sangster*).)

N.M. contends the trial court erred in granting summary judgment in favor of CHCM. We address his contentions that the trial court erred first as to his medical malpractice claim, and then his false imprisonment claim.

2. *Medical Malpractice*

Because the pleadings frame the relevant issues for purposes of summary judgment (*Wassmann v. South Orange County Community College Dist.* (2018) 24 Cal.App.5th 825, 851), we begin with N.M.’s first cause of action in his second amended complaint, in which he asserted that CHCM committed medical malpractice.

N.M. alleged as the gravamen of his claim that CHCM and its employees: “In their examination, diagnosis, advice, care, treatment and administration of medical care to N.M. Son, defendants . . . failed to exercise that degree of skill and care commonly possessed and exercised by health care providers, medical practitioners, medical doctors, psychiatric professionals, medical specialists, physicians, nurses, aides or medical facilities who perform the same and similar treatment and diagnostic procedures in the area where defendants practice.” N.M. alleged CHCM personnel “negligently and carelessly [and] unskillfully examined, misdiagnosed and/or treated . . . N.M. Son, including but not limited to misrepresentation of facts in order to detain plaintiff for a much longer period [than necessary] against his will.” N.M. does not identify any specific, alleged misrepresentation of facts; instead, he seems to suggest through his pleading that CHCM personnel were wrong in concluding he was a proper subject for a hold.

"The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305 (*Johnson*).)

To prove a medical malpractice claim, the plaintiff must first establish the applicable standard of care and then demonstrate that the standard of care was breached. (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122 (*Powell*).) "Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts' [citation], expert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard prevailing of care' unless the negligence is obvious to a layperson." (*Johnson*, *supra*, 143 Cal.App.4th 297, 305.) Similarly, "'[c]ausation must be proven within a reasonable medical probability based upon competent expert testimony.'" (*Dumas v. Cooney* (1991) 235 Cal.App.3d 1593, 1603; see also *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1498 [expert testimony required to establish medical negligence caused patient's injury].)

A medical malpractice defendant who supports a summary judgment motion with applicable expert declarations "'is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence.'" (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 984-985 (*Munro*); *Powell*, *supra*, 151 Cal.App.4th at p. 123.) CHCM submitted a lengthy declaration by a board-certified psychiatrist describing the acts undertaken by individual CHCM personnel while N.M. was in CHCM's care at the hospital. The psychiatrist attested that the level of care complied with the applicable standard of care and thus caused N.M. no injury through medical negligence.

N.M. did not rebut this evidence with evidence as was his obligation in opposing summary judgment. The contents of the two letters he attached to his amended

9

complaint were not responsive on the issues presented regarding N.M.'s malpractice cause of action. Neither author said anything about the applicable standard of care for any of CHCM's personnel, whether those individuals met or fell short of that standard based on the information available to them at the time, or whether anything CHCM personnel did or did not do caused N.M. to suffer any medical injury. In other words, they focused on N.M., not on anyone rendering care to N.M. In fact, they made no mention of CHCM. In the absence of any conflicting expert testimony on the performance of CHCM personnel in relation to a medical standard of care, CHCM was entitled to summary resolution of N.M.'s medical malpractice claim in its favor. (*Munro*, *supra*, 215 Cal.App.3d at p. 985.)

Invoking the doctrine of res ipsa loquitur, N.M. contends that "[s]ometimes . . . the medical malpractice is so obvious that [expert opinion as to medical negligence or causation of injury is] not needed," as "when a surgeon leaves a sponge in the patient." N.M. insists there was such a self-evident breach of "the normal standard of care" here because "[i]t is illegal to place a minor on a gravely disabled hold (adults only) *no matter what*." (Italics added.) In effect, N.M. seeks to have a presumption of negligence under the doctrine of res ipsa loquitur (Evid. Code, § 646, subd. (b)) serve as a substitute for producing evidence of the applicable standard of medical care and breach of that standard.

However, the authorities N.M. cites do not establish that a minor may not be found gravely disabled; indeed, they do not mention minors or distinguish them from adults. (WIC, § 5008, subd. (h)(1)(A); CACI Nos. 4002, 4005.) They therefore do not support his contention that the treatment provided by CHCM personnel rose to the level of "self-evident" medical malpractice. N.M.'s reliance on the doctrine of res ipsa loquitur is therefore without merit.

In asserting a claim for medical malpractice, N.M. asks that the conduct of CHCM personnel be judged by the standards of the medical community, i.e., the standard

10

of care according to professionals in that discipline.  Having provided no evidence of what that standard was in the form of expert testimony, as was his duty to defeat summary judgment (*Powell*, *supra*, 151 Cal.App.4th at p. 122; *Munro*, *supra*, 215 Cal.App.3d at p. 985), N.M.'s medical malpractice claim necessarily failed to advance past the summary judgment stage.

        3.     *False Imprisonment*

The core of N.M.'s false imprisonment claim as alleged in his second amended complaint is that CHCM personnel confined him "against his will or consent or legal right . . . ."  False imprisonment is a tort.  (*Easton v. Sutter Coast Hospital* (2000) 80 Cal.App.4th 485, 496.)  "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time . . . ."  (*Ibid.*)

Under the Lanterman-Petris-Short Act (WIC, § 5000 et seq.), "a person who is dangerous or gravely disabled due to a mental disorder may be detained for involuntary treatment."  (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 979 (*Ford*).)  Nevertheless, it has long been held that involuntary hospitalization "'*in violation of* [the governing statutes] constitutes false imprisonment.'"  (*Jackson v. Cedars-Sinai Medical Center* (1990) 220 Cal.App.3d 1315, 1322.)

The statutes envision incremental detention when necessary.  (*Ford*, *supra*, 89 Cal.App.4th at p. 979.)  The "first step" is a "72–hour treatment and evaluation" hold authorized by WIC section 5150.  (*Ford*, at p. 979.)  Under this code section, certain officials (including law enforcement and certain medical professionals) are authorized to bring an individual to a designated mental health facility for evaluation if there is "probable cause to believe that the person is, as a result of a mental disorder, a danger to others, or to themselves, or gravely disabled."  (WIC, § 5150, subd. (e).)  Depending on the outcome of the evaluation, various statutes may authorize further detention.  (See, e.g., §§ 5250 [intensive 14–day treatment]; 5270.15 [certification for additional treatment

11

for "not more than 30 days"]; 5300 [up to 180–day commitment for the imminently dangerous]; 5352.1 [30-day temporary conservatorship for the gravely disabled]; see generally *Gonzalez v. Paradise Valley Hospital* (2003) 111 Cal.App.4th 735, 740, fn. 4 (*Gonzalez*).)

Balanced against the safeguards embodied in these statutes, the Legislature has also recognized that "'reasonable decisions as to how to control particular patients should not be chilled, *at the time they are made*, by the prospect of liability.'" (*Johnson v. County of Ventura* (1994) 29 Cal.App.4th 1400, 1410, italics added.) Thus, individuals authorized to detain patients involuntarily, including medical practitioners, "shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." (WIC, § 5278; see, e.g., *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068, 1080-1081 (*Heater*).)

This language has been construed to mean that no liability can arise when a medical provider's decision resulting in an involuntary detention "is supported by probable cause." (*Jacobs v. Grossmont Hospital* (2003) 108 Cal.App.4th 69, 76 (*Jacobs*); *Gonzalez, supra,* 111 Cal.App.4th at p. 741.) A critical feature in determining the existence of probable cause is that a detention decision may not be second-guessed with alleged facts unknown to the medical provider: "'Each case must be decided on the facts and circumstances presented to the [detaining person] *at the time of the detention* . . . .'" (*Heater, supra,* 42 Cal.App.4th at p. 1080, italics added, brackets in original.)

Here, CHCM supported its summary judgment motion with expert witness declarations that, based on the facts known to CHCM personnel when they evaluated N.M., all holds placed on N.M. "were applied properly, with sufficient probable cause, and in accordance with the law." That does not mean, as N.M. correctly observes, that the assessments by CHCM personnel or its expert were dispositive on the question of probable cause—if N.M. submitted contrary evidence. Indeed, the opinions of the individual medical practitioners and CHCM's expert were not even dispositive as

12

medical assessments given that, as Ross's expert expressly acknowledged, "health care professionals [can] differ on a patient's diagnosis."

Nevertheless, the evidence CHCM presented as the foundation for its expert's opinion did put in issue the question of probable cause for summary judgment purposes because it was sufficient for a trier of fact to conclude that probable cause for the holds existed. In seeking summary judgment, the moving party is not required to present evidence that conclusively establishes its claim. Rather, the moving party must make a prima facie showing of a right to judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851.) "A prima facie showing is one that is sufficient to *support* the position of the party in question. [Citation.] No more is called for." (*Id.* at p. 851, italics added.)

In his opposition, it was incumbent on N.M. to present evidence that probable cause to hospitalize him did not exist. To do so, a plaintiff may not merely restate allegations from his or her pleadings, as N.M. does repeatedly in his appellate briefing. The plaintiff must produce admissible evidence to support those allegations and identify that evidence in his or her separate statement of facts opposing judgment. At the summary judgment stage, the case has progressed past "'mere allegations . . . of [the] pleadings'" to an evaluation of the evidence presented for and against summary judgment. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1594.)

Because the existence of probable cause defeats a plaintiff's case for false imprisonment (*Jacobs*, *supra*, 108 Cal.App.4th at p. 76), once a moving defendant meets his or her initial burden, as here, "to show the action has no merit" (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1292), the burden of production of evidence "shifts to the plaintiff to demonstrate the existence of a triable issue of material fact" (*id.* at pp. 1292-1293). This can be accomplished by producing "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." (*Bhan v. NME Hospitals, Inc.* (9th Cir. 1991) 929 F.2d 1404, 1409.)

13

In N.M.'s opposition to summary judgment he did not identify in his separate statement of facts any information known to CHCM personnel (including Ross and Schwartz), or that they should have known, which might have negated probable cause to detain N.M. At summary judgment, the parties' separate statements are critically important because they pinpoint evidence for the trial court to consider so it can determine whether there is any factual conflict that must be resolved by the jury. (See *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315 (*San Diego Watercrafts)* [evidence left undisclosed in a party's separate statement may properly be ignored].)

Here, N.M.'s opposition to summary judgment did not identify any evidence that undermined Ross's, Schwartz's, or any other CHCM personnel's probable cause assessments supporting continued detention at the time they made them. Instead, N.M. asserted in a conclusory fashion that "[d]efendants never had any proof of N.M. Son being a danger to himself or others in accordance with the criteria required by the rules WIC § 5150." (Original underlining.) N.M. did not identify for the trial court in his separate statement any evidence that contradicted the assessments by CHCM personnel that he was a danger to himself or others; in other words, N.M. did not set forth a conflict in the evidence for the trier of fact to resolve at trial.

N.M. failed to produce any evidence of "'[*un*]reasonable decisions . . . at the time they [were] made'" (*Johnson v. County of Ventura*, *supra*, 29 Cal.App.4th at p. 1410) based on the "circumstances presented to the [detaining person] at the time of the detention'" (*Heater*, *supra*, 42 Cal.App.4th at p. 1080). He did not identify in his separate statement any contradictory evidence communicated to Ross, Schwartz, or CHCM personnel, or that they otherwise knew or should have known such that a trier of fact could conclude they lacked probable cause for a hold.

In fact, N.M. did not respond with *any* evidence disputing probable cause in his separate statement; instead, he offered only legal argument. For example, he claimed

14

"[i]t is illegal to place a minor on a WIC §5270 hold or §5250 hold." He added, without citation to any evidence, "There was also no parental consent."

N.M.'s legal analysis was wrong. WIC sections 5250 and 5270.15 neither state nor suggest it is illegal to detain a minor under their provisions once a 72-hour hold under sections 5150 or 5585 expires. To the contrary, section 5585.53 provides that involuntary treatment of a minor is "allowed in accordance with the provisions of the Lanterman-Petris-Short Act . . . commencing with [s]ection 5000," which by those express terms includes sections 5250 and 5270.15. Moreover, while "[e]very effort shall be made to involve the minor's parent or legal guardian in the clinical evaluation" (§ 5585.52), "[i]nability to obtain the consent of the minor's parent or legal guardian shall *not* preclude the involuntary treatment of a minor who is determined to be gravely disabled or a danger to himself or herself or others" (§ 5585.53, italics added).

Furthermore, N.M.'s separate statement identified no evidence to rebut CHCM's citation to evidence that CHCM personnel "met with N.M. Son's parents and uncle to review history and treatment," or that N.M.'s relevant history included all of the following: "outpatient psychiatric treatment," a partial hospitalization program, lack of compliance with Trintellix and Prozac prescriptions, and multiple instances of threatening serious self-harm.

Nor did N.M. provide contrary evidence to rebut the opinion offered by Ross's expert, and adopted by CHCM's expert, that, during his course of treatment at CHCM, N.M. "should not have been discharged to the care of his family." The expert opined that N.M.'s "symptoms and threats were serious and required professional care. In my opinion, in order for a physician to discharge a patient in such a situation, if discharge was appropriate, the patient's parents must be very cooperative and understand the child has a serious illness and requires continued care and monitoring. In this situation, [N.M.]'s dad repeatedly expressed that his son was normal and demanded discharge. Therefore, even though [N.M.]'s family environment was 'stable' . . . his

15

parents would not have been able to adequately care for him. They grossly underestimated his illness."

In opposition, N.M. offered regarding his parents' response only his father's declaration that he "asked for release of his son," that he asserted "N.M. Son is not mentally ill," and that he "has no history of detainment." N.M. Dad also referenced in his declaration opposing summary judgment the two "expert doctor letters for N.M. Son" attached to the amended complaint; he did not suggest he had provided to Ross or Schwartz or anyone at CHCM the letter or similar evidence from the doctor who allegedly had been treating N.M. since 2018. Nor did N.M. Dad or either of the doctors in their letters address the serious threats reported by school authorities and the detaining officer, which Schwartz followed up on with the school psychologist. At a minimum, as set forth in CHCM's separate statement, the school psychologist verbally confirmed for Schwartz the existence of the threats on social media and reiterated her concerns about N.M.'s "history of unsettling behavior and comments."

As to the alleged threats, N.M.'s opposition to summary judgment involved his "Fifth Amendment constitutional right against self-incrimination" in relation to the detaining officer's questioning of N.M. "alone as a minor." (Original underlining.) (See *J.D.B. v. North Carolina* (2011) 564 U.S. 261.) But these authorities and the exclusionary rule in the context of a criminal prosecution have no application to a medical provider's reliance on a person's alleged statements and recent behavioral history in the context of providing medical care. More to the point, N.M. did not in his separate statement or anywhere in his opposition identify evidence he or his parents conveyed to Ross or Schwartz or CHCM personnel *at the time of his treatment* that would cause a reasonable medical provider to question the reliability of reports about his behavior.

On appeal, he elides reliance by CHCM personnel on the officer's report that N.M. admitted "that he made the posts as a joke" by shifting to not-quite-denials that

16

it "has . . . never been proven that N.M. Son actually made that post" and "not[ing] that imposter . . . and fake chat room postings are very common." A party's statements, however, are not inadmissible under the hearsay rule. (Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party"]; *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 430, fn. 6.) Claims not supported by admissible evidence do not create a conflict in the evidence; a triable issue of fact requires evidence that is both admissible and substantial, not merely speculative or conjectural. (*Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 217; *Sangster*, *supra*, 68 Cal.App.4th at p. 163.) The trial court therefore reasonably could conclude that N.M. Dad's unsupported requests that N.M. be released and N.M.'s bare denials he made any serious threats did not create a triable issue of fact concerning whether CHCM personnel had probable cause to continue N.M.'s hold.

N.M. *did* challenge CHCM's showing of probable cause on grounds that its expert's account of N.M.'s course of treatment based on CHCM medical records did not disclose probable cause. But unlike N.M., the witness provided—and CHCM's separate statement referenced—the foundational facts in those records supporting probable cause when N.M. was in CHCM's care. Medical records are admissible, as here, under the business records exception to the hearsay rule. (*In re Troy D.* (1989) 215 Cal.App.3d 889, 902.)

An expert "may rely on various sources of information, including hearsay, in forming an opinion." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 646; Evid. Code, § 801, subd. (b).) This applies equally to a medical provider evaluating a patient's mental condition. (*People v. Bona* (2017) 15 Cal.App.5th 511, 522 ["exclusion of the challenged evidence would not have precluded [the doctor] from stating the opinions upon which that evidence was based"].) Thus, the trial court did not abuse its discretion in finding that N.M.'s evidentiary objections based on hearsay, foundation, and other grounds failed to derail summary judgment. (See *Sanchez v. Kern Emergency Medical Transportation*

17

*Corp.* (2017) 8 Cal.App.5th 146, 154 [abuse of discretion standard applies to evidentiary rulings related to summary judgment].)

At best, N.M.'s challenges went to the weight to be given CHCM's probable cause evidence based on the opinions of its retained expert and its treating personnel, not the admissibility of those opinions or supporting evidence, and therefore the evidence could be considered in support of summary judgment. (See *Guastello v. AIG Specialty Insurance Co.* (2021) 61 Cal.App.5th 97, 105-106 [alleged "'weakness in the underpinnings of such [expert] opinions may be developed upon cross-examination,'" but "'go[] to the weight and credibility of the testimony,'" not whether it met "admissibility requirements"].) In the absence of substantial, admissible, conflicting evidence on the probable cause question, the trial court did not err in granting CHCM summary judgment.

N.M. did not reference the court's prior habeas ruling in his favor anywhere in his separate statement as evidence that probable cause was lacking, though he makes that ruling a centerpiece of his appellate challenge. In any event, the ruling would not have precluded summary judgment had N.M. mentioned it. By statute, the issue before the trial court in considering a habeas petition for release under WIC section 5276 is whether "the person requesting release *is*" (italics added) a danger to others or to himself or gravely disabled due to a mental disorder: "If the court finds, (a) that the person requesting release *is not*, as a result of mental disorder or impairment by chronic alcoholism, a danger to others, or to himself or herself, or gravely disabled, (b) that he or she had not been advised of, or had accepted, voluntary treatment, or (c) that the facility providing intensive treatment is not equipped and staffed to provide treatment, or is not designated by the county to provide intensive treatment [then] he or she shall be released immediately." (*Ibid.*, italics added.)

The use of the present tense in the statutory language requires us to conclude that the habeas court's decision standing alone—without any reference to what

evidence was before the court, or any explanation by the court of its decision—does not establish that probable cause to legally hold N.M. disappeared at any particular time before that ruling was made.  Thus, the release order on June 6 is not evidence that probable cause never justified N.M.'s detention, or that a continued hold became unwarranted at any time before the hearing.  In the absence of a triable issue of fact, the trial court properly granted summary judgment.

In his appellate briefing, N.M. advances a plethora of other arguments in opposition to summary judgment, none supported by admissible evidence identified or referenced in his separate statement in opposition to summary judgment or elsewhere in his opposition papers.  Those unsupported claims, arguments, or theories are therefore insufficient to defeat summary judgment.

## DISPOSITION

The judgment is affirmed.  CHCM is entitled to its appellate costs.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

19